Marlin Enos NELSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 70711.

Court of Criminal Appeals of Texas, En Banc.

Nov. 25, 1992.

Rehearing Denied Jan. 20, 1993.

Randy McDonald, on appeal only, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., Mary Lou Keel, Claire Connors, Ned Morris, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

BENAVIDES, Judge.

Appellant was convicted of capital murder. See V.T.C.A., Penal Code, Section 19.-03(a)(2). After the jury returned an affirmative finding on both of the special issues submitted under Article 37.071(b)(1) and (2), the trial court imposed the penalty of death. This case is before us on direct appeal.

### I

### SUFFICIENCY CLAIM

Appellant alleges that the evidence is insufficient to support the conviction; therefore, a review of the facts is necessary. James Randle Howard lived in an apartment at 3402 Garrott Street in Houston, Texas. Howard was known by his friends to be homosexual. On August 25, 1987, his downstairs neighbor, Joe Castagno, came home at 6:00 p.m. Castagno was reading a paper when he heard an automobile arrive. From his window Castagno saw Howard and a young man carrying a plastic sack go upstairs to Howard's apartment. Twenty to thirty minutes later Castagno heard sounds which he described as "thuds and bumps" coming from Howard's residence. About thirty minutes after this, Castagno saw the young man come down the stairs and enter Howard's automobile. The man appeared to have difficulty starting the Honda and then getting it in proper gear, but soon he was able to drive the automobile away. Castagno did not observe the man carrying anything when he came downstairs, and later was unable to identify the appellant in a police lineup.

Howard did not report for work at Southwestern Bell at 11:00 p.m. as scheduled the night of August 25. He did not telephone his supervisor at anytime during the 11:00 p.m. to 7:00 a.m. shift and his co-workers became worried. They attempted to telephone the victim's residence, but there was no answer. Ann Hatteberg, a friend and co-worker for five years, drove by Howard's residence, located in the Montrose area of Houston, during the night and noticed that Howard's automobile, a black Honda, was missing. Later, Hatteberg contacted local hospitals and the police in an unsuccessful attempt to locate Howard. At the conclusion of her shift, Hatteberg and another co-worker, Doa Tran, drove back to Howard's apartment. His automobile was still absent. Hatteberg and Tran obtained entry to the apartment complex, and, after knocking and getting no answer, Hatteberg broke a window and the two of them crawled inside.

Hatteberg observed a tray on the living room floor containing marijuana. Hatteberg was aware that Howard smoked marijuana. On the coffee table she saw a beer can, and this struck her as unusual because, she testified, Howard did not drink. She also observed black leather gloves on the couch, which she regarded as unusual because she did not think Howard would wear black leather gloves in August. At trial the gloves were identified as similar to

a pair owned by Howard. Blood was discovered on the right hand glove. After a brief search, Hatteberg and Tran came to the bedroom door. The door was locked, and Hatteberg broke in. She and Tran found Howard's body on the floor in a large pool of blood.

Aurelio Espinola, deputy chief medical examiner for Harris County, testified at trial that Howard had suffered a number of blows to the body and had been stabbed fifteen times. He had a fractured skull and died as a result of blood loss.

In the bedroom near Howard's body police discovered a bloody ten-pound exercise bar and a butcher knife which, Espinola testified, were instruments that could have made wounds consistent with Howard's wounds. In addition to the butcher knife and exercise bar, police found a bloody steak knife and, on the bed, a telephone whose cord had been severed. Also on the bed were various papers and a suitcase containing pornographic material. Appellant's fingerprints were lifted from a piece of paper on the deceased's bed, a lighter on the floor, the bathroom door, and a can of Miller Lite beer that had been retrieved from the kitchen trash can.

Katherine Ann Howard, the deceased's sister, and her parents later came to Houston to collect his personal property. Howard owned an expensive stereo system, television, and two video cassette recorders, all of which were found in his apartment. However, Katherine Howard discovered that missing were a gold necklace, all of her brother's watches, including a Gucci watch, his camera and lenses, and several shares of stock. The safe was open and empty and the key to it was missing.

Michael Gramblin testified that he met appellant on either August 25 or 26 and at that time appellant was driving a relatively new gray or black compact automobile. Gramblin had never seen him in such a nice vehicle. Gramblin testified that he visited appellant in jail where appellant told him not to tell the prosecutors about the automobile. Gramblin was aware that appellant had financial problems. Sharon Hambrick, appellant's sister, also testified that appellant was having financial problems.

Early in the afternoon of August 28, Todd Janke, a Houston police officer, was working his second job as security patrol for an apartment management company. Janke observed appellant operating a motorcycle with a faded rear license plate. Appellant drove the motorcycle off the premises of the apartment complex Janke was patrolling, onto a public street, and then back to the apartment complex about fifteen minutes later. When appellant stopped, Janke approached, determined that the license plate was expired, and asked appellant for some identification. When appellant opened his wallet, Janke observed a plastic baggie in it, which was later determined to contain cocaine. Appellant was arrested.

At about 9:45 p.m. on August 28, Houston Police Detectives D.L. Bacon and John Burmester met with appellant and took what was to be the first of two statements from him. In his first statement appellant said that he, a person named Mike, and Howard had driven to Howard's apartment after smoking marijuana. Nothing in the statement indicates why they went to the apartment. Ultimately, Mike and Howard began to argue. The statement then reads, somewhat cryptically, "Mike and the man [Howard] then went into the bedroom where they began yelling. The man bloody. Mike then handed me a duffle bag, a two-way speaker and another smaller bag. Mike then went back in the room, and I heard the man start yelling. Then it became very quiet." According to the statement, appellant and Mike drove to various locations in Howard's automobile. The statement closed by noting that a cassette player and speakers might be at the apartment of Sharon Hamrick, appellant's sister. After taking this statement Bacon and Burmester transported appellant to the Hamrick's apartment. From Hamrick's apartment they retrieved a Sony Walkman and a set of speakers. Doris Nelson, appellant's common-law wife who was living at Hamrick's apartment with her husband, testified that an acquaintance of appellant, David Jolly, had brought the Sony Walk-

man and speakers to her. At trial these items were determined by serial number and receipt to belong to the deceased. In addition, Bacon and Burmester recovered a pair of earrings from another tenant who lived in the same apartment complex as Hamrick. Ann Hatteberg testified that the earrings had been presents she had given to Howard.[1]

Early on the morning of August 29 Detective Burmester took a second statement from appellant. The statement read:

I have already made one statement about the guy that picked me up in the black Honda car. What I said in that Statement [sic] was not all true. I decided to get it all off my chest and tell the truth [sic]. The man picked me up at the McDonalds on Westhimimer [sic] by Waugh Drive. The guy circled the block about 10 times and slowed down every time he came by and looked at me. Then he stopped and asked me if I wanted to smoke a joint. I got in the car with him and we went to his apartment. I had a paper sack with some beer in it and I took it along. It was a plastic sack with handles in it. On the way to his apartment he told me that he had some chrystal, and that was why I went with him, to his apartment after smoking a joint with him.

When we got to the apartment we walked upstairs together. As soon as we got in he gave me the chrystal and I did it. I had a needle and shot up in the arm. I told him that I wanted to play with his weights after I shot up and went into bedroom. He followed [sic] me in there. I picked up a bar off of the box that was lying in back of the weight set. He was looking at me and I went up on him and busted him with the bar. I kept hitting him and he kept knocking things over. He went down, but he kept moving. There was a steak knife or a kitchen knife or something on the dresser. It looked like he had been cutting some rubber thing with it and he was half way through with it. I got the knife and

while he was lying on the floor moving around I stabbed him. I kind of blocked everything out and [sic] just kept stabbing him. Every time I hit him I got angrier.

I went into the closet and got a gray sports bag, then I started going through everything and threw all the jewelry in the bag. I took sun glasses, the Sony Walkman and speakers, billfold which had about $50 in it, the keys to his car which were on the table in the dining room. That's about it. Then I left, went to the car, got in and after getting going after having a bunch of trouble with reverse, I pushed it into the street and then left there.

The first thing I did was I went and got some Chrystal [sic]. Then I picked up Mike and Tim, I told then [sic] that I bought the car. Then we went and picked up a friend of theirs and went out to his cocaine connection [sic]. Tim had a gun, a 9mm. Her boyfriend was there but he never woke up. The girl is a white girl but I don't know her name. It was about an ounce and a half of powder cocaine.

Then we went to Davids [sic] and did some of the cocaine. We stayed there all night doing cocaine. About 9 in the morning I left and went to a drag queens apartment in the Rosewood Apartments to get a needle. When I got back Tim was gone with the car, all the other stuff was still in the car. We had brought the bag up and looked through it, but Tim took it back to the car afterwards. When I got arrested all I had left was about a half a gram of cocaine, pure stuff, and the gucci [sic] watch I got from the queer. The only time I ever saw the car again it was in a business parking lot [sic] when I went looking for it the morning I got caught. I never got rid of any of the other stuff I got out of the apartment and don't know anything other than that David gave by [sic] wife a Sony Walkman and the speakers.

**1.** Houston Police recovered an automobile matching the description of Howard's automo- bile on August 31, 1987.

In point of error number one appellant complains that the evidence is insufficient to support a conviction for capital murder. Paragraph one of appellant's indictment charges that "while in the course of committing and attempting to commit the Robbery of James Randle Howard," appellant intentionally caused Howard's death by beating him with a metal bar. Paragraph two charges that "while in the course of committing and attempting to commit the Robbery of James Randle Howard," appellant intentionally caused Howard's death by stabbing him with a knife.[2]

When reviewing sufficiency of the evidence this Court must decide "whether, after viewing the evidence in the light most favorable to the prosecution *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307 at 319, 99 S.Ct. 2781 at 2789, 61 L.Ed.2d 560 at 573 (emphasis in original).

Appellant lists four elements for both alleged offenses:
(1) the defendant
(2) intentionally
(3) caused the death of the deceased
(4) while in the course of committing a robbery of the deceased.

Appellant concedes that a rational trier of fact could find from the evidence that he intentionally caused the death of Randy Howard. We agree. A rational trier of fact could find from the appellant's second statement given to the police, the nature and extent of Howard's wounds, and the discovery of Nelson's prints in the deceased's apartment that, beyond a reasonable doubt, Marlin Nelson intentionally caused Howard's death.

However, appellant argues that a rational trier of fact could not find element number four beyond a reasonable doubt. We disagree. To find element number four a rational juror would have to find beyond a reasonable doubt that Nelson murdered Howard in the course of committing or attempting to commit robbery. Therefore, the same juror would have to find all the elements of robbery beyond a reasonable doubt. The elements of robbery that are relevant for the facts of this case are as follows:
(1) a person
(2) in the course of committing theft
(3) with the intent to obtain or maintain control of the property
(4) intentionally causes bodily injury to another.

Appellant concedes that a rational trier of fact could find from Nelson's second statement and the subsequent discovery of Howard's property in the apartment where Nelson lived that, beyond a reasonable doubt, Nelson committed theft. However, appellant argues that a rational trier of fact could not find beyond a reasonable doubt that when he murdered Howard and took his property the murder was done *with the intent to obtain or maintain control of the property.*

Appellant refers us to two of our recent treatments of this issue and complains that we seem to be suggesting that in all cases where there is evidence that a theft occurs after the victim is murdered this evidence will support a jury finding of murder in the course of a robbery. See *Huffman v. State,* 746 S.W.2d 212 (Tex.Cr.App.1988) and *McGee v. State,* 774 S.W.2d 229 (Tex. Cr.App.1989). It is true that in both of the above-cited cases we stated that the evidence will be sufficient if the State proves that a **robbery** of the victim occurred immediately after the murder of the victim. *Huffman,* 746 S.W.2d at 217, and *McGee,* 774 S.W.2d at 234. However, as should have been plain from our analysis of the evidence in both decisions, and, as we stated in *White v. State,* 779 S.W.2d 809, at 815 (Tex.Cr.App.1989):

the point at which appellant formulated his intent to take his victim's property is critical to differentiating, in the abstract, between his commission of capital murder in the course of robbery and his commission of first degree murder, followed by theft.... Therefore, the ulti-

---

**2.** The jury charge authorized a conviction under either paragraph one or two of the indictment and also contained instructions on the lesser included offenses of murder and robbery.

mate question before us in this case is whether **any** rational trier of fact would be justified in finding from the evidence as a whole, that appellant intended to take [his victim's] property before, or as, he murdered her.

Contrary to the suggestion of appellant, we recognize that it is possible to have murder followed by theft without having murder in the course of robbery. What elevates the occurrence of theft to robbery is the presence, at the time of, or prior to, the murder, of the intent to obtain or maintain control of the victim's property. Thus, if the State proves that the requisite intent was present, it has proven that a murder occurred in the course of robbery, although the element of appropriation occurred after the murder.

Our review of the entire record convinces us that a rational trier of fact could find that the appellant formed the intent to obtain and maintain control of the deceased's property prior to or at the time of the assault on Howard. Appellant was in financial difficulties, indicating one possible motive for the crime. Appellant went through deceased's property, took some valuables, including a billfold which contained $50.00, and then took Howard's car. A rational juror might also have inferred from Howard's possession of drugs and appellant's drug use that appellant went to the victim's apartment in order to assault him and take his drugs or obtain money for drugs. Indeed, appellant's second confession reflects that after leaving the apartment the first thing he did was to get some "chrystal." Finally, appellant had ample time and opportunity to familiarize himself with the deceased's property and form the requisite intent.

Appellant suggests that there is an explanation for the murder that is as equally consistent with the theory that he murdered Howard with the intent to steal from him; i.e., that the deceased looked at appellant in a lustful way and that this drove appellant into a rage, causing him to murder Howard. It is true that the evidence indicated that Howard was a homosexual. In addition, appellant's second confession indicates that he observed the deceased follow him into the bedroom and look at him, and that appellant became angrier as he struck the deceased. However, the jury was not required to believe that the deceased looked at appellant in a lustful way. Nor was it required to believe that was appellant's only motivation for killing Howard even if it felt that Howard did so. We assume that the jury considered all of the evidence and any potential inferences and decided that appellant's theory was not reasonable. Appellant's first point of error is overruled.

## II

### SUPPRESSION OF EVIDENCE CLAIM

In point of error number two, appellant complains that the trial court erred in admitting into evidence appellant's written statements obtained after his allegedly unlawful arrest. The record shows that Officer Janke observed appellant with a female passenger driving a motorcycle on the premises of an apartment complex Janke patrolled. Janke observed a faded, unreadable license on the rear of the motorcycle as it exited the complex. Janke decided to question the driver, if the motorcycle returned or if he saw it later on the street. Appellant returned on the motorcycle about fifteen minutes later. As Janke approached, he determined that the license was, in fact, expired. He then asked appellant for identification. When appellant produced his wallet and opened it to procure his identification, Janke observed a small, zip-lock bag in the wallet. Janke suspected that the bag contained cocaine and arrested appellant. A computer comparison of fingerprints obtained after his arrest matched appellant's prints to those found on a piece of paper in the deceased's apartment. This led to appellant's interrogation and, ultimately, to the two statements which he gave police.

Article 14.01(b), V.A.C.C.P., provides that "[a] peace officer may arrest an offender without a warrant for any offense committed in his presence or within his view." At the outset appellant contends that Janke purportedly arrested him for the traffic

violation of operating a motorcycle on a public street without a properly authorized license. *See* V.T.C.A., Article 6675a–3e, Section 6. It is appellant's position that at the time of arrest appellant was not operating the motorcycle; that the motorcycle was on private property; and no evidence ever established that the street on which Janke observed appellant operating the motorcycle when appellant exited the apartment complex was a public street. For all these reasons, appellant asserts, no offense was being committed in the officer's presence or view, and his arrest was, therefore, illegal. With respect to the latter assertion, appellant is flatly incorrect. During trial, Janke confirmed that the street on which he observed appellant was a public street. With respect to the first two assertions, it appears to be appellant's contention that for a person to be arrested without a warrant pursuant to the applicable statute, a person must literally be committing an offense at the moment of arrest. This would be a sufficient but not required predicate for a warrantless arrest. An officer must only have probable cause for arrest. The test for probable cause is:

> Whether at that moment the facts and circumstances within the officer's knowledge and of which (he) had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the (arrested) person had committed or was committing an offense.

*Lunde v. State*, 736 S.W.2d 665, 667 (Tex. Cr.App.1987), citing *Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). When Janke approached appellant he observed that the license tag was expired, and at that moment, having previously observed appellant operate the vehicle on a public street, he had probable cause to arrest appellant.

▆ In the alternative, appellant argues that appellant's arrest was based on a pretext and was invalid. Approximately one week prior to the arrest Janke had been informed that a suspect in a murder case had been seen around the apartments Janke patrolled. The description of the suspect and appellant's physical appearance were, apparently, similar. Appellant asks us to find that Janke's stop and arrest was actually based on nothing more than a hunch that appellant was the murder suspect. Thus, he argues, his Fourth Amendment rights were violated and his confessions should have been suppressed. We disagree. In *Garcia v. State*, 827 S.W.2d 937 (Tex.Cr.App.1992), we adopted the following rule for evaluating pretextual stop claims: "As long as an actual violation occurs, law enforcement officials are free to enforce the laws and detain a person *for that violation* regardless of whatever the usual practices or standards of the local law enforcement agency are and regardless of the officer's subjective reasons for the detention." (Emphasis in original) Nothing in Janke's testimony indicates that he stopped appellant for any reason other than the traffic violation. Janke did nothing more than what the law allows, and, therefore, an inquiry into his subjective intentions is irrelevant. Point of error two is overruled.

## III

### CLAIMS RESPECTING CHALLENGES FOR CAUSE

▆ In point of error three, appellant contends that the trial court improperly granted the State's challenge of prospective juror Mona Miles for cause. A proper standard to be used in disqualifying prospective jurors in death penalty cases is whether their views would prevent or substantially impair the performance of their duties as jurors in accordance with the instructions given and the oaths given. *Davis v. State*, 782 S.W.2d 211, 216 (Tex. Cr.App.1989). Given that the trial court is in the best position to gauge the demeanor and responses of the prospective juror, we give great deference to the trial court, and we will not reverse the court's decision to dismiss a venireperson except on a clear showing that the court abused its discretion. *Id.* at 216.

The voir dire of Miles reflects that at first she testified that she would answer the special issues "yes" if proven beyond a reasonable doubt, then she expressed doubt

about her ability to answer "yes" to the second special issue, then, finally, she testified that she would answer "no" to the second special issue so that the death penalty would not be assessed. Miles vacillated as to her ability to follow her oath as a juror. "Under such circumstances the trial court is in the best position to evaluate the venireman's answers and rule accordingly." *Ransom v. State,* 789 S.W.2d 572, 582 (Tex.Cr.App.1989, cert. denied, 497 U.S. 1010, 110 S.Ct. 3255, 111 L.Ed.2d 765 (1990)). The record supports the trial court's finding that Miles was not qualified for jury service and we find no abuse of discretion. Appellant's third point of error is overruled.[3]

In point of error four appellant contends that the trial court improperly excluded Miles sua sponte. We disagree. Although we are unable to find in the record a specific motion by the State's attorney to the court that he wished to challenge the venireperson for cause, appellant immediately objected when the court excused Miles, and, during his argument to the court in support of his objection, he specifically stated that he was objecting to the State's challenge for cause. In addition to appellant's reference to the State's challenge for cause, the trial court, in response to appellant's objection, made it clear that the basis for excusing the juror was her inability to follow the law. Thus, the remarks of defense counsel and the trial judge indicate that the court's action was predicated on a challenge for cause made by the State. Finally, the jury strike list which was filed in this cause lists the venireperson as having been struck by a challenge for cause. *See Fearance v. State,* 771 S.W.2d 486, 508, n. 5 (Tex.Cr.App.1988). Point of error four is overruled.

■ In point of error five, appellant contends that the trial court committed reversible error by overruling his motion challenging prospective juror Michael Haver-

korn for cause. After the trial court's action, appellant used a peremptory strike on Haverkorn. The State contends that appellant's point has not been preserved. We agree. "Error is preserved only if the defendant exhausts his peremptory challenges, is denied a request for an additional peremptory challenge, identified a member of the jury as objectionable and claims that he would have struck the juror with a peremptory challenge." *Demouchette v. State,* 731 S.W.2d 75, 83 (Tex.Cr.App.1986). The record reflects that appellant exhausted his fifteen peremptory challenges. However, the record also reflects that appellant sought and was granted two additional peremptory challenges, and that the trial judge offered him an additional peremptory challenge. The record does not reflect that appellant was ever denied a request for an additional peremptory challenge. Nor does the record reflect that appellant identified an objectionable juror and claimed that he would have struck that juror with a peremptory challenge. Therefore, we find that error was not preserved. Point of error five is overruled.

## IV

## CLAIMS UNDER *ESTELLE v. SMITH*

■ In points of error six, seven, and eight appellant contends that the trial court erred in admitting the testimony of witnesses Dr. Jackson Smith, Dr. Jim Phillips, and Debra Levy. Appellant complains that statements made to these witnesses while appellant was in custody were not made voluntarily with the knowledge that the statements could be used against appellant in future judicial proceedings. Smith, Phillips, and Levy were, respectively, a psychiatrist, a psychologist, and a dormitory supervisor at Giddings State School in 1984 when appellant, who was a resident at the school, made the complained-of statements. A division of the Texas Youth Commission,

---

3. Appellant also complains that a question directed to Miles by the State which asked her about her intention to vote "no" to the special issues if the defendant were seventeen years old was an attempt to commit the witness to a specific set of facts and, thus, an improper attempt to commit her to a verdict. We will not address the merits of this claim as the defendant did not object to the hypothetical question at the time it was asked and answered. Nothing was preserved for review. Tex.R.App.P. 52(a).

Giddings houses youth found delinquent for violent offenses. Appellant was at Giddings because he had been adjudicated delinquent for the offense of attempted capital murder.

The statements were admitted during the punishment phase as proof that appellant would constitute a continuing threat to society. In the statements appellant, according to the witnesses, cold-bloodedly described the offense for which he had been confined to Giddings—an attempted murder-robbery—and admitted sixty to seventy other assaults, some of which, according to appellant, may have resulted in deaths.

Appellant urges us to expand the doctrine of *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), to cover the circumstances under which appellant gave his statements and, accordingly, find that appellant's constitutional right against self-incrimination and right to counsel were violated.[4] In *Estelle* the United States Supreme Court held that the Fifth and Sixth Amendments of the United States Constitution were violated by the admission of a doctor's testimony on the issue of future dangerousness when that testimony was based on the questioning of a defendant who had not been warned of his Fifth Amendment privilege against self-incrimination and whose counsel had not been informed that the State intended to conduct the examination.

We find that *Estelle* is inapplicable to the facts of appellant's case. Appellant's statements were given four years prior to the capital murder trial which is the subject of this appeal. The Fifth Amendment is not implicated because, at the time appellant made his statements, he was not confronted with someone who was essentially an agent for the State whose function was to gather evidence that might be used against him in connection with the crime for which he was incarcerated. *See Estelle*, at 466, 101 S.Ct. at 1875. The Sixth Amendment cannot be implicated because there was no adverse judicial proceeding pending against appellant when he spoke to the witnesses. In other words, the statements made to the witnesses were "prior to the alleged offense, the indictment, the appointment of counsel, etc., and [were] not in connection with testifying as to the issue of future dangerousness." *Cook v. State*, 741 S.W.2d 928, 945 (Tex.Cr.App.1987), *rev'd on other grounds*, 488 U.S. 807, 109 S.Ct. 39, 102 L.Ed.2d 19 (1988). The statements were properly admitted. Points of error six, seven, and eight are overruled.

V

PENRY CLAIM

In point of error nine, appellant complains that the trial court erred by failing to properly charge the jury that it could consider the mitigating evidence submitted by the appellant in determining whether he should receive a life sentence.[5] The record reflects, and appellant acknowledges, that he asked for and was granted the following special jury charge:

> In determining the answers to Special Issues, you may consider the entire evidence in mitigation of punishment such as the Defendant's age, family history, social background, drug use and intoxication to assist you.

---

4. *See* U.S. Const. amends. V, VI, and XIV; Tex. Const. Art 1, sections 9, 10, and 19; and Article 38.23, V.A.C.C.P.

5. Judge Baird is quite right to point out in his concurring opinion that Appellant has not complied with Rule 74(d), Texas Rules of Appellate Procedure. Clearly, Appellant has not directed the attention of this Court to portions of the record where the evidence claimed to be mitigating appears. Accordingly, we are not obliged to reach the merits of his *Penry* claim. But, neither are we obliged summarily to overrule it, as Judge Baird implies. In the present context, because the State has identified and presented argument in its brief concerning a considerable body of evidence upon which it believes Appellant might rely, we think it best to discuss the mitigating value of that evidence as it relates to the rule of *Penry*, particularly since Appellant does not challenge the State's characterization of his claim. We think this method especially appropriate in contexts such as this one where, because Appellant was tried prior to the Supreme Court's decision in *Penry*, his points of error on the subject may be raised again in an application for writ of habeas corpus to the extent not addressed in this opinion.

Now appellant argues on appeal that the special charge failed to advise the jury how to respond should the jury consider the mitigating evidence before them sufficient to render a sentence of life as opposed to death. Appellant sets out a suggested charge which instructs the jury to enter a negative finding to a special issue if it determines that a life sentence is the appropriate response to mitigating evidence.

The United States Supreme Court, in *Jurek v. Texas*, 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929, 941 (1976), held that the Texas sentencing scheme guided the jury's discretion by "narrowing the class of death eligible crimes and by requiring the jury to answer additional special issues regarding deliberateness, future dangerousness and provocation." *Barefield v. State*, 784 S.W.2d 38, 45 (Tex.Cr. App.1989), *cert. denied*, 497 U.S. 1011, 110 S.Ct. 3256, 111 L.Ed.2d 766 (1990). Thus, the death penalty sentencing statute is facially valid. *See Penry v. Lynaugh*, 492 U.S. 302, 315, 109 S.Ct. 2934, 2945, 106 L.Ed.2d 256, 276 (1989). However, in *Penry*, the Court found that, as applied to that petitioner, our framework of special issues did not by themselves allow the jury to express its reasoned, moral response to Penry's evidence of mental retardation and child abuse. In analyzing *Penry*-type issues we examine the particular evidence offered by appellant to determine if it is relevant to appellant's personal moral culpability and, if so, whether the jury was able to adequately respond to that evidence. *See Goss v. State*, 826 S.W.2d 162 (Tex.Cr.App.1992).

 While it is difficult to determine from appellant's brief the evidence he contends was of mitigating value, the record reveals that several witnesses testified during the punishment phase as follows: that appellant was a nice person, not considered by them to be violent; that appellant was a good worker when employed; and, that appellant enjoyed a good social relationship with a friend of his sister and that friend's mother. Testimony from the latter two witnesses indicated that, because of their employment, they were frequently in pos-

session of large quantities of money, and that appellant never took any of it. Such evidence has been held by this court to be relevant to the special issues; however, it does not constitute *"Penry"*-type evidence requiring an additional instruction in order to allow the jury to give a reasoned, moral response. *See Lackey v. State*, 819 S.W.2d 111, 134 (Tex.Cr.App.1991). *See also Black v. State*, 816 S.W.2d 350, 365 (Tex. Cr.App.1991).

Other mitigating evidence included the following: appellant was young (nineteen at the time of the commission of the offense); appellant had been subjected to family strife when very young (father used drugs and, during physical beating of older siblings, pushed appellant); and, appellant had engaged in religious activities. However, although relevant to the concerns of special issue two, this evidence, like the evidence *supra*, is not *"Penry"* evidence requiring an additional instruction. *Id.*, slip op. at 11; *Boggess v. State*, 1991 WL 87597 (Tex.Cr.App. No. 69,990, May 29, 1991); *Goss, supra* at 166; *see also Nobles v. State*, 843 S.W.2d 503, 507–08 (Tex.Cr. App.1992), and cases cited therein.

There was evidence that appellant had a history of drug abuse. In addition, his confessions revealed that he used drugs on the occasion of the murder. However, we have found that evidence of drug use alone does not rise to the level of *"Penry"* evidence," *Ex Parte Ellis*, 810 S.W.2d 208, 212 (Tex.Cr.App.1991), nor does evidence of voluntary intoxication at the time of the murder. *Goss, supra* at 166.

Sergeant LaCoste of the Harris County Sheriff's Department testified that during pretrial incarceration he had had no problems with appellant and that appellant kept his cell clean. In *Franklin v. Lynaugh*, 487 U.S. 164, 177–180, 108 S.Ct. 2320, 2330, 101 L.Ed.2d 155, 169 (1988), the United States Supreme Court found that evidence of a good prison record has no significance outside the second special issue.

 Finally, in a confession to another capital murder which appellant evidently perpetrated a short time prior to the of-

fense in the case before us, appellant made the following claim:

> When I hit him I thought about what happened to me when I was 11 years old and I was molested. I never told anybody about it, but I wanted to in the past. I always wanted to tell my sister, but never did. I wanted to tell my brother, but I never did because [sic] I didn't want him to look at me like I was a faggot. I been hating guy queers ever since that happened.

In *Gribble v. State*, 808 S.W.2d 65, 76 (Tex.Cr.App.1990), we held that the evidence of child abuse and other circumstances introduced on behalf of that appellant could not be given mitigating effect by the jury when considering their answers to the special issues. In that case the evidence consisted not only of appellant's claims of a troubled and insecure childhood but also of expert testimony from a psychoanalyst who testified that after much effort he persuaded appellant to reveal to him that appellant's mother had sexually abused him as a child. It was the expert's opinion that appellant's experiences provided a substantial explanation for his subsequent history of violence, and, further, that appellant's positive personality traits, contrasted with his violent behavior, were indicative of severe mental illness, depression, and psychotic illusions. *Id.* at 75. Gribble, according to the expert testimony, suffered from a true psychosis in which episodes of violent criminal behavior were typically followed by feelings of intense remorse. If true, we found that appellant's circumstances would ameliorate fault and were such as to require that the jury be given some "instructive device," apart from the special issues, with which to give effect to appellant's mitigating evidence.

We acknowledge, of course, that victims of child abuse are thought by some people to be less culpable for their criminal misconduct later in life. And when it appears that an aberration of character or conscience attributable to abuse or neglect during childhood is at work in a particular crime, we regard it is fitting that the sentencing authority have power to mitigate punishment on this basis. But we do not

consider it imperative, nor constitutionally indispensible, that a reasoned moral response be solicited from capital jurors about every minutia of a defendant's developmental history. *Lewis v. State*, 815 S.W.2d 560 (Tex.Crim.App.1991). Nor do we think it necessary to submit the question of extra-statutory moral culpability without a substantial showing that some significant circumstance has actually disabled the conscience of a defendant to a degree recognized as mitigating by a representative segment of our society. *Accord, Graham v. Collins*, 950 F.2d 1009 (5th Cir.1992), *cert. granted* — U.S. ——, 112 S.Ct. 2937, 119 L.Ed.2d 563.

To be sure, appellant's confession does intimate that he was sexually molested in some manner as a child. But it does not describe the nature or the source of such abuse, even though it is plain that he was embarrassed by the encounter. Indeed, it is not even necessarily an inference from his confession that the person who "molested" him was acting illegally. For all we know, such abuse may have been limited to a vulgar remark, an indecent exposure, or a suggestive proposition. Without some further evidence of significant moral dysfunction attributable to the experience, we are unwilling to conclude that an isolated and unexplained event producing irrational hatred for a whole class of people is quite the kind of mitigating circumstance envisaged by the United States Supreme Court in *Penry*.

Certainly, we do not mean to diminish the seriousness of child abuse, whether physical, sexual, or psychological. But appellant has provided far too little information about his alleged mistreatment as a child to raise a *bona fide* issue that his fault for the brutal murder of James Randle Howard was ameliorated at all by an impairment of conscience or character arising from it. Accordingly, we hold that no issue making necessary an extra-statutory jury instruction on moral culpability was fairly raised by the evidence in this case.

Since the evidence did not require an instruction under *Penry*, we need not determine whether the court's instruction ac-

tually given would have been adequate had it been necessary to provide the jury with a vehicle to consider their reasoned moral response. Appellant's ninth point of error is overruled.

The judgment and sentence are affirmed.

MILLER, OVERSTREET and MALONEY, JJ., concur in the result.

BAIRD, Judge, concurring.

In his ninth point of error, appellant contends Tex.Code Crim.Proc.Ann. art. 37.071, as applied, violated the Eighth and Fourteenth Amendments of the United States Constitution, in failing to provide a vehicle for the jury to give effect to appellant's mitigating evidence. The State responds:

> Appellant failed to identify the mitigating evidence and to argue how the special issues failed to allow consideration of the mitigating evidence. Therefore, nothing is presented for review. His ninth point of error should be overruled for its failure to meet the requirements of Tex.R.App.P. 74(d).

State's brief, pg. 66.

I agree. Appellant's brief wholly fails to identify what he believes to be mitigating evidence. Further, appellant fails to show how such evidence, if any, was "not relevant to" and/or "beyond the scope" of the punishment issues as required by *Penry v. Lynaugh*, 492 U.S. 302, 320, 109 S.Ct. 2934, 2948, 106 L.Ed.2d 256 (1989) (Quoting *Franklin v. Lynaugh*, 487 U.S. 164, 184, 108 S.Ct. 2320, 2333, 101 L.Ed.2d 155 (1988)). Clearly, not all mitigating evidence requires a vehicle; some mitigating evidence can be given full effect within the issues submitted under art. 37.071. *See Boyd v. State*, 811 S.W.2d 105, 112 (Tex.Cr. App.1991) ("Appellant's evidence, which does not rise to the level of anything more than common courtesy, was given full effect within the second special issue [footnote omitted]"). Accordingly, I would summarily overrule the ninth point of error.

However, I write separately to briefly address the majority's incorrect application *Penry*. The majority states:

> ... Nor do we think it is necessary to submit the question of extra-statutory moral culpability *without a substantial showing* that some significant circumstance *has actually disabled the conscience* of a defendant to a degree recognized as mitigating by a representative segment of our society. [citations omitted]

\* \* \* \* \* \*

> ... Without some further evidence of *significant moral dysfunction attributable to the experience,* we are unwilling to conclude that an isolated and unexplained event producing irrational hatred for a whole class of people is quite the kind of mitigating circumstance envisaged by the United States Supreme Court in *Penry*.[1]

Maj. op. at 137.

Simply stated, such statements are erroneous. There is no requirement under the Eighth Amendment of a "substantial showing" of a "disabled conscience." Moreover, *Penry* should not be limited to situations of a "significant moral dysfunction attributable to [a childhood] experience." Because the majority continues to read *Penry* far too narrowly, I concur in the result only.

CLINTON, Judge, dissenting.

In my view the evidence is insufficient to support the jury verdict that appellant committed murder in the course of robbery. The evidence shows without serious dispute that after the assault appellant went through Howard's property, took some valuables, and then took his car. That appellant in fact ultimately took valuable property belonging to Howard is certainly evidence showing that he formulated an intent to obtain or maintain control over the property at *some* point in time. There is nothing in the evidence to lead a rational juror to infer, however, that the requisite intent was formulated before or during the homicide, and not afterwards. The record presents no rational basis to prefer either theory. This is no more than to say that as to the element of specific intent, the State

---

**1.** Unless otherwise indicated, all emphasis herein is supplied.

has failed to carry its burden of production. Looking at all the evidence in the light most favorable to the verdict, I do not see how a rational trier of fact could decide beyond a reasonable doubt *when* the intent to take Howard's property was formed.

Today the majority sanctions jury confabulation; plugging evidentiary gaps with speculation about what might have happened that is at least consistent with what the State *has* proved. But confabulation is not itself proof. We should reverse the judgment of the trial court in this cause and remand for entry of a judgment of acquittal. Because the Court does not, I respectfully dissent.