TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-96-00039-CR







Wayne Hepner, Appellant



v.



The State of Texas, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT


NO. 0942991, HONORABLE JON N. WISSER, JUDGE PRESIDING






A jury found appellant guilty of capital murder. Tex. Penal Code Ann. § 19.03(a)(2) (West
1994). Because the State did not seek the death penalty, the district court assessed punishment at
imprisonment for life. Tex. Penal Code Ann. § 12.31(a) (West 1994); Tex. Code Crim. Proc. Ann. art.
37.071, § 1 (West Supp. 1998). Appellant brings forward four points of error challenging the sufficiency
of the evidence and complaining of the admission of scientific evidence. We will affirm. 

The body of the deceased, Carmen Calderon, was found at 3:00 p.m. on March 30, 1994,
in the dining room of the house he shared with his sister and brother-in-law, Janie and Emilio Cruz. The
medical examiner determined that he had been cut or stabbed sixty-six times. Most of these wounds were
superficial or defensive in nature. Four stab wounds, however, penetrated Calderon's heart and lungs, and
were fatal.

A large amount of blood had soaked into the carpet where Calderon's body lay. Blood
was also splattered on the wall, and chairs and an ironing board had been knocked over, suggesting that
there had been a struggle. Footprints, apparently made in blood and all displaying the same distinctive
tread pattern, led from the body into the kitchen and back, then through the dining room and up the stairs
to Calderon's bedroom. In the bedroom, drops of blood were found on a chest of drawers and in the
closet. Notably, the intruder walked past but did not take numerous valuable items, including television sets
and a videocassette recorder.

Calderon kept several hundred dollars in cash in a wallet in his bedroom. The wallet was
not found after the murder. Calderon also regularly purchased jewelry which he kept in coffee cans in his
closet. Cruz testified that Calderon often showed this jewelry to him. Cruz noticed that many of the items
bore a white sticker with the word "Monet," a brand name. 

Calderon worked nights as a member of the cleaning crew at an Austin department store. 
His coworkers were Doug Stanley, Angel Ronje, and appellant. Cruz testified that Calderon spent a lot
of time with these men and that appellant regularly visited Calderon in his home. In fact, appellant had
visited Calderon only two days before the murder. Stanley and Ronje testified that Calderon was known
to keep money and jewelry in his room.

Lori Bellinger, an acquaintance of appellant, testified that he came to her house at about
1:00 p.m. on the day of the murder. He had alcohol on his breath and blood on his clothes. Appellant told
Bellinger he had cut his hand "at a store." Appellant asked Bellinger to go with him in his car to make a
purchase. Bellinger noticed in the back seat of appellant's car "a couple of coffee cans pretty full of
jewelry." Later, she examined the jewelry more closely and saw that much of it had "little tags [that] said
Monet." Appellant and Bellinger drove to an unspecified location where she made the purchase with
money given to her by appellant. (1) They returned to Bellinger's house, but soon left to make another
purchase, after which they drove to appellant's house. Bellinger spent the rest of the afternoon at
appellant's residence, leaving periodically in appellant's car to make purchases with money he gave her. 
Eventually, appellant ran out of cash and instructed Bellinger to take the jewelry in the coffee cans and sell
or trade it "for what he wanted." Bellinger returned to appellant's house after one of her errands and found
that he was gone. She left a message for appellant to call her and drove home.

Appellant was not at home because he was being questioned by the police. Austin police
officer Daniel Zahara and another officer went to appellant's house at about 8:00 p.m. on March 30 after
learning that appellant was one of Calderon's coworkers. When the officers, who were not in uniform,
identified themselves as police officers, appellant "became very pale, swaying." Zahara "thought he was
going to faint." Zahara noticed that appellant had a bandage on his right ring finger and that blood was
dripping from the wound. Appellant told the officer that he cut his finger helping his father "hook up a
trailer." Appellant agreed to go to the police station, where he gave the officers a written statement that
was entirely exculpatory. He allowed the police to take his shoes and samples of his blood, hair, and saliva,
and signed a written consent to search his residence. The officers took appellant home after arranging to
meet him the following day for further questioning.

Appellant was not home when the officers arrived the next morning. They learned that he
had gone to Pennsylvania, where he was arrested several days later. No incriminating evidence was found
during a search of appellant's house.

A Department of Public Safety expert made a test print of appellant's left shoe and
compared it to the prints found at the murder scene. He testified that the prints, including the random nicks
and scratches referred to as "accidental characteristics," were identical. He concluded that the prints at
the scene were made by appellant's left shoe and no other shoe. Human blood was found on the soles of
the shoes but could not be typed. Blood found on the top portions of the shoes was consistent with
appellant's blood type, but not Calderon's.

Three samples of the blood drops found in Calderon's bedroom, together with samples
of appellant's and Calderon's blood, were analyzed at the Department of Public Safety laboratory. 
Appellant's blood was found to have the same PGM blood enzyme type (1-, 1+) as the blood found in the
bedroom, while Calderon's PGM blood type was different (1-). The prelinear chain reaction (PCR) test,
a form of DNA analysis, also showed a match between the bedroom blood samples and appellant's blood
(both were type 1.2, 4), but no match with Calderon's blood (type 4). According to the persons who
performed these tests, the PGM and PCR results demonstrated that the blood in the bedroom could have
been appellant's but could not have been Calderon's. The evidence also reflects that 14.7 percent of the
North American population is PCR type 1.2, 4. 

A second DNA test, the restriction fragment length polymorphism (RFLP) test, was also
performed on the blood samples. Once again, the test showed a match between appellant's blood and the
bedroom blood samples. The State's expert testified that the probability of finding an unrelated person at
random whose DNA characteristics would match the crime scene blood was 1 in 5.5 billion.

In determining the legal sufficiency of the evidence to support a criminal conviction, the
question is whether, after viewing all the evidence in the light most favorable to the verdict, any rational trier
of fact could have found the essential elements of the offense beyond a reasonable doubt. Jackson v.
Virginia, 443 U.S. 307 (1979); Geesa v. State, 820 S.W.2d 154 (Tex. Crim. App. 1991); Griffin v.
State, 614 S.W.2d 155 (Tex. Crim. App. 1981). In this cause, appellant does not deny that the blood
and shoe print evidence supports a finding that he was present either during or after Calderon's murder. 
He also concedes that the evidence supports a finding that he was in possession of Calderon's property
after the murder. He argues, however, that the evidence does not support his conviction for capital murder
because the State did not prove beyond a reasonable doubt that he murdered Calderon or, alternatively,
that he murdered him in the course of committing robbery.

Appellant's argument rests in part on the contention that the State did not disprove two
alternative hypotheses: (1) that he was not involved in the murder but merely stole Calderon's property
after the murder was committed, or (2) that he murdered Calderon but formed the intent to steal only after
the murder was committed. This argument fails because the "reasonable alternative hypothesis construct,"
by which circumstantial evidence was deemed legally insufficient if it did not exclude all reasonable
alternative hypotheses inconsistent with guilt, has been abolished. Geesa, 820 S.W.2d at 161. (2) It was for
the jury, as trier of fact, to determine the proper inferences to draw from the evidence. If the circumstantial
evidence, viewed in the light most favorable to the verdict, supports a finding of guilt beyond a reasonable
doubt, the evidence is legally sufficient and it is irrelevant that the jury could have viewed the evidence more
favorably to the accused.

Viewed in the light most favorable to the jury's verdict, the evidence shows that appellant
fatally stabbed Calderon, cutting himself in the process, then went to Calderon's bedroom, bleeding from
the cut on his hand, and stole the money and jewelry he knew Calderon kept there. Appellant then sought
out Bellinger and, still in his bloody clothes, began making purchases with Calderon's money and jewelry. 
From this evidence, and the evidence that appellant had ample time and opportunity to familiarize himself
with Calderon's property and plan his actions, the jury could rationally conclude that appellant formed the
intent to steal Calderon's property before he murdered him, and therefore that the murder was committed
in the course of robbery. See Nelson v. State, 848 S.W.2d 126, 131-32 (Tex. Crim. App. 1992). The
evidence is legally sufficient to sustain appellant's conviction for capital murder. Point of error one is
overruled.

In his three remaining points of error, appellant contends the district court erred by
admitting random match probability (RMP) evidence that estimates the probability that a randomly selected
person will match the DNA profile of trace evidence. As noted above, the serologist who performed the
DNA tests at the Department of Public Safety laboratory testified that the probability of a randomly
selected person having a DNA profile that matched the blood found in Calderon's bedroom was 1 in 5.5
billion. Appellant urges that this RMP estimate should not have been admitted because the State failed to
establish its relevance and reliability, and because any probative value the evidence might have had was
substantially outweighed by the danger of confusion and unfair prejudice.

Appellant filed a motion to exclude the results of all DNA tests. At the pretrial hearing on
this motion, the only witness to testify was Dr. Jonathan Koehler, an assistant professor at the University
of Texas Graduate School of Business and adjunct professor at the University of Texas School of Law. 
Koehler's expertise is in statistical evidence and behavioral statistics, and he has published articles on the
subject of statistical errors in the presentation of DNA evidence. Called by the defense, Koehler testified
that a random match probability estimate is essentially meaningless in determining the probative value of a
reported match between a defendant's DNA and the DNA of biological traces found at the scene of a
crime. The significance of such a match is determined instead by the laboratory error rate; that is, by the
testing laboratory's record of making false positive matches. For example, if the laboratory's false positive
error rate is one percent, there is a 1 in 100 chance that the reported match between the defendant's DNA
and the trace DNA is erroneous. In such a case, a random match probability of 1 in 5 billion does not
accurately reflect the likelihood that the defendant was the source of the trace DNA, because an RMP
estimate assumes a correct match. In this example, the likelihood that the defendant was not the source
of the trace DNA is closer to 1 in 100, the laboratory error rate, than to the 1 in 5 billion RMP estimate. 
It was Kohler's opinion that RMP estimates are of no probative value whenever the random match
probability is significantly smaller than the laboratory error rate. According to Koehler, some laboratory
proficiency tests have shown that one to four percent of reported DNA matches are erroneous. 

Koehler further testified that studies have shown that fact-finders give greater weight to
evidence of a reported DNA match when they are told the RMP estimate than when they are told only the
laboratory error rate. In one of these studies, conducted by Koehler and using as subjects persons who
had been called for jury duty in Travis County, the subjects were given hypothetical fact situations in which
the defendant's guilt of a crime was primarily dependent on a reported match between his DNA and the
DNA of blood found at the scene of the crime. One group of subjects was told that there was a 1 in 1
billion probability of a random DNA match. A second group was told that there was a 1 in 1000
probability that the reported DNA match was erroneous. A third group was told both the random match
and erroneous match probabilities. The first group, told only the RMP figure, found the defendant guilty
more often than the second group, told only the probability of a false positive match. Members of the third
group, told both probabilities, were as likely to find the defendant guilty as members of the first group. This
demonstrated, said Koehler, that the statistically insignificant RMP figure had a greater impact on the
subjects' decision-making process than the more significant laboratory error rate. Koehler attributed this
to a misunderstanding of admittedly confusing statistical concepts. Kohler opined that the tendency of juries
to give undue weight to RMP estimates renders such evidence unfairly prejudicial.

At the conclusion of Kohler's testimony, the court and defense counsel engaged in the
following colloquy:


THE COURT: . . . [T]he defense believes . . . that [the jury will] give vastly greater
weight to that [RMP] number as opposed to the error rate and your position is the error
rate makes that other number somewhat meaningless in effect; that the only crucial number
is an error rate . . . .


MR. SMITH: In essence that is the argument and I don't think it matters what the
error rate is if the expression of the RMP comes in and it's in a range far greater than that
or smaller, however you want to phrase it.


THE COURT: What precludes an attorney from calling a witness such as the one
you just had to explain to the jury? I can see just giving them the survey the bigger number,
you know, obviously one in a billion strikes someone much harder than one in a thousand. 
They tend to give that more weight. But if you had a witness such as that to explain it to
them, it's still your position that they would be incapable of understanding it even after an
explanation?


MR. SMITH: No, I'm not saying that they would be incapable of it. I'm simply
stating that the-- that when that random match probability statistic comes in under the rules
of criminal evidence that it's so prejudicial, it's so unfairly prejudicial that it completely
outweighs and overshadows any probative value that that number would express.


. . .


And it's not that the jurors [are] not intelligent but the Texas Rules of Criminal
Evidence obviously contemplated occasions when evidence which would otherwise be
probative is so outrageously prejudicial that the jury cannot be expected to make that
determination. Otherwise why would we have Rule 403 of the Texas Rules of Criminal
Evidence[?]


. . .


In any event, what we're trying to keep out in this hearing is the RMP frequencies,
trying to keep that out from the jury. If our expert . . . looks at those autorads and
compares those and makes a determination that they appear to be a reported match, we're
certainly not going to have any objection to that at trial. We don't intend to wage a battle
about the admissibility of DNA evidence.



There is no record of a ruling on appellant's pretrial motion. At trial, appellant did not object to the
admission of the expert testimony concerning the results of the PCR and RFLP tests, but did object to the
RMP testimony. Appellant now contends only that the State should not have been permitted to adduce
the evidence that the random match probability was 1 in 5.5 billion.

The threshold determination regarding the admission of expert testimony about scientific,
technical, or other specialized knowledge is whether the testimony will help the trier of fact understand the
evidence or determine a fact in issue. Kelly v. State, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992);
Duckett v. State, 797 S.W.2d 906, 910 (Tex. Crim. App. 1990); Tex. R. Evid. 702. (3) When, as in this
cause, a trial court is faced with an offer of expert testimony on a scientific topic unfamiliar to lay jurors,
the court's first task is to determine whether the testimony is sufficiently reliable and relevant to help the jury
in reaching accurate results. Kelly, 824 S.W.2d at 572. The burden of persuasion is on the proponent to
demonstrate by clear and convincing evidence, outside the presence of the jury, that scientific evidence is
reliable and therefore relevant. Id. at 573. After the trustworthiness of the evidence has been established,
the trial court also must determine if the probative value of the expert testimony is outweighed by the danger
of confusion, unfair prejudice, or any of the other considerations identified in Texas Rule of Evidence 403. 
Id. at 572. (4)

Appellant's pretrial motion broadly sought the exclusion of all DNA evidence on the
authority of Kelly and rules 403, 702, and 705. Appellant did not obtain a ruling on this motion. 
Furthermore, counsel told the court at the hearing that appellant did not seek the exclusion of the DNA test
results but only the exclusion of the random match probability estimates. Counsel articulated appellant's
objection to the RMP testimony only in terms of rule 403: that whatever probative value the RMP evidence
might have was substantially outweighed by the danger of confusion and unfair prejudice arising from the
tendency of the jury to give undue weight to such evidence. We therefore conclude that appellant did not
preserve for appeal his complaints that the State did not prove the reliability of the RMP evidence, that the
RMP evidence was in fact unreliable, and that the underlying facts or data did not provide a sufficient basis
for the RMP testimony. 

Appellant's contention that the RMP testimony should have been excluded pursuant to rule
403 is based on Koehler's testimony regarding the tendency of fact-finders to give undue weight to random
match probabilities, even when they are told the statistically more significant probability that the reported
DNA match is the result of human or other error. The determination whether the danger of confusion or
unfair prejudice outweighs the probative value of relevant evidence must be made in view of the availability
of other means of proof and other factors appropriate for making decision of this kind under rule 403. See
Montgomery v. State, 810 S.W.2d 372, 389 (Tex. Crim. App. 1991) (opinion on rehearing). The trial
court must be given wide latitude to exclude or not to exclude evidence under rule 403. Id. at 390. So
long as the court operates within the boundaries of its discretion, an appellate court should not disturb its
decision, whatever it may be. Id. While the Montgomery opinion dealt with evidence of extraneous
misconduct, appellate courts must show the same deference to the trial court's decision to admit or exclude
scientific evidence. See Kelly, 824 S.W.2d at 574.

Assuming the accuracy of the reported DNA match, the random match probability was
obviously relevant to the question whether the blood found in Calderon's bedroom came from appellant. 
Even accepting as true the contention that untutored jurors tend to ignore the possibility of laboratory error
and thereby give undue emphasis to the RMP estimate, the district court could reasonably decide that the
probative value of the RMP evidence outweighed rule 403 concerns. As the court noted at the hearing,
Koehler's studies of juror behavior did not take into account the possibility of educating the jurors, through
expert testimony at trial, about the relative significance of RMP estimates and laboratory error rates. 
Koehler, in his testimony at the pretrial hearing, was able to clearly and understandably explain why the
probability of an erroneous match was of greater probative significance than the random match probability. 
The district court could reasonably conclude from this that it was possible to admit the RMP estimates
without confusing the jury or unfairly prejudicing appellant. The district court's decision to admit the RMP
testimony over appellant's rule 403 objection was within the zone of reasonable disagreement, and
therefore not an abuse of its discretion. 

Even if the admission of the random match probability evidence was error under either rule
702 or rule 403, the error did not affect appellant's substantial rights and was therefore harmless. Tex. R.
App. P. 44.2(b); see King v. State, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (applying new
harmless error rule in pending appeal). The evidence that the intruder went directly to Calderon's
bedroom, ignoring valuable property as he did so, suggested that the murder/robbery was the act of
someone, like appellant, who knew Calderon and where he kept his money and jewelry. The bloody
footprints at the scene were made by appellant's shoe. The drops of blood were matched to appellant by
blood enzyme type and by two DNA tests. Appellant had blood on his clothes, cash, and coffee cans of
jewelry like Calderon's on the afternoon of the murder. Appellant was obviously nervous when the police
arrived at his house and left the city that night, breaking an appointment to meet the police the next day. 
Given all of this evidence pointing to appellant as the murderer, any error in admitting the random match
probability estimate was harmless. Points of error two, three, and four are overruled.

The judgment of conviction is affirmed.



 

 Marilyn Aboussie, Justice

Before Justices Powers, Aboussie and B. A. Smith

Affirmed

Filed: March 26, 1998

Publish
1. The jury was not told, but the record otherwise reflects, that Bellinger and appellant were buying
crack cocaine.
2. Each of the opinions cited by appellant in which evidence was deemed legally insufficient applied the
reasonable alternative hypothesis construct: Burns v. State, 676 S.W.2d 118, 120 (Tex. Crim. App.
1984); Nathan v. State, 611 S.W.2d 69, 78 (Tex. Crim. App. 1981); Flores v. State, 551 S.W.2d 364,
367-69 (Tex. Crim. App. 1977); Turner v. McKaskle, 721 F.2d 999 (5th Cir. 1983) (relying on Texas
cases applying the construct).
3. Texas Rules of Evidence 403, 702, and 705, adopted effective March 1, 1998, are substantively
identical to the corresponding criminal evidence rules in effect at the time of appellant's trial.
4. A similar test for admissibility applies under the federal rules. See Daubert v. Merrell Dow
Pharmaceuticals, Inc., 509 U.S. 579, 590-92 (1993).



exclude or not to exclude evidence under rule 403. Id. at 390. So
long as the court operates within the boundaries of its discretion, an appellate court should not disturb its
decision, whatever it may be. Id. While the Montgomery opinion dealt with evidence of extraneous
misconduct, appellate courts must show the same deference to the trial court's decision to admit or exclude
scientific evidence. See Kelly, 824 S.W.2d at 574.

Assuming the accuracy of the reported DNA match, the random match probability was
obviously relevant to the question whether the blood found in Calderon's bedroom came from appellant. 
Even accepting as true the contention that untutored jurors tend to ignore the possibility of laboratory error
and thereby give undue emphasis to the RMP estimate, the district court could reasonably decide that the
probative value of the RMP evidence outweighed rule 403 concerns. As the court noted at the hearing,
Koehler's studies of juror behavior did not take into account the possibility of educating the jurors, through
expert testimony at trial, about the relative significance of RMP estimates and laboratory error rates. 
Koehler, in his testimony at the pretrial hearing, was able to clearly and understandably explain why the
probability of an erroneous match was of greater probative significance than the random match probability. 
The district court could reasonably conclude from this that it was possible to admit the RMP estimates
without confusing the jury or unfairly prejudicing appellant. The district court's decision to admit the RMP
testimony over appellant's rule 403 objection was within the zone of reasonable disagreement, and
therefore not an abuse of its discretion. 

Even if the admission of the random match probability evidence was error under either rule
702 or rule 403, the error did not affect appellant's substantial rights and was therefore harmless. Tex. R.
App. P. 44.2(b); see King v. State, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (applying new
harmless error rule in pending appeal). The evidence that the intruder went directly to Calderon's
bedroom, ignoring valuable property as he did so, suggested that the murder/robbery was the act of
someone, like appellant, who knew Calderon and where he kept his money and jewelry. The bloody
footprints at the scene were made by appellant's shoe. The drops of blood were matched to appellant by
blood enzyme ty