Opinion filed November 2, 2006


















 
 
 The Court on this day, November 30, 2006, has withdrawn this opinion
 and judgment dated November 2, 2006, and substituted the opinion and judgment
 dated November 30, 2006.
 
 







 
 
  
 
 




Opinion filed November 2, 2006

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh Court of Appeals

                                                                   __________

 

                                                          No. 11-05-00039-CR 

                                                    __________

 

                                 FRANCES KAY HERMAN, Appellant

 

                                                             V.

 

                                        STATE
OF TEXAS,
Appellee

 



 

                                    On
Appeal from the 259th District Court

 

                                                             Jones County, Texas

 

                                                       Trial
Court Cause No. 9304

 



 

                                                                   O
P I N I O N

 

Frances Kay Herman (Fran) appeals her conviction
by a jury of the offense of murder.  The jury
assessed her punishment at thirty years confinement in the Texas Department of
Criminal Justice, Institutional Division, and a fine of $5,000.  In three issues, Herman contends that the
evidence is legally and factually insufficient to support her conviction and
that the trial court erred by denying her motion for mistrial based on the
State=s
improper argument applying the parole law. 
We affirm.








Herman argues in issues one and two that the
evidence is legally and factually insufficient to support her conviction
because the State failed to prove that she intentionally and knowingly caused
the death of her husband, William Anderson Herman.  In a legal sufficiency review, we view all of
the evidence in the light most favorable to the verdict and then determine
whether a rational trier of fact could have found the essential elements of the
crime beyond a reasonable doubt.  See Jackson
v. Virginia, 443 U.S.
307 (1979).  In a factual sufficiency review, we view all of the evidence
in a neutral light, and we will set the verdict aside only if the evidence is
so weak that the verdict is clearly wrong and manifestly unjust or the contrary
evidence is so strong that the standard of proof beyond a reasonable doubt
could not have been met.  See Zuniga v. State, 144 S.W.3d 477,
484-85  (Tex. Crim. App. 2004).

Crystal Kropp testified that on November 22, 2003,
she was working for Jones County Dispatch, which was basically the 9-1-1
office.  She said that in the early
morning hours of that day, at 5:10 a.m., she received a phone call from someone
named Linda Rutledge.  According to
Kropp, Rutledge told Kropp that Fran called Rutledge to say that she and her
husband had had a disturbance and that he had accidentally shot himself.  Kropp recounted that Rutledge told her the
Hermans were in a gold or green pickup on the road to Fort Phantom.  Kropp indicated that she received a second
call at 5:28 a.m. from the residence of Steve Brazee.  She testified that the caller indicated that
her neighbors were arguing outside and that one of them had been shot.

On cross-examination, Kropp acknowledged that she
never talked to Fran and did not know what she told Rutledge or anyone
else.  She indicated that she believed
the caller from the Brazee residence was Margaret Brazee.  








Margaret Brazee testified that about 5:00 or 5:30
a.m. on November 22, 2003, she heard Fran banging the door.  She indicated that Fran was upset and was
saying that her husband Will had been shot. 
Margaret indicated that she and her husband went out to the road where
Will was.  She stated that Fran wanted
her to help get Will in the pickup so Fran could take him home because he was
hurt.  Margaret related that her husband,
Steve, knowing Will was dead, told her to get a sheet, call 9-1-1, the sheriff,
and then cover Will with the sheet. 
Margaret testified that she went into the house, got the sheet, called
9-1-1, came back out, and tried to help Fran get Will into the pickup.  Margaret said she did not think Will was
dead.  She indicated that at that point
her husband insisted they leave Will alone because he was dead.  

Margaret testified that after the sheriff came she
and Fran went into her house.  She said
she loaned Fran some sweats because the officers needed her clothes and shoes.  She stated Fran was still crying and
upset.  She indicated that off and on she
would see tears.  Subsequently, she said
she did not notice any tears in the house.

Margaret testified that Fran told her that Will
was shot when she and Will were fighting over a gun.  She indicated that Fran said she thought she
had her finger on the trigger and it might have gone off and that she and Will
were wrestling over it.  She said Fran washed
her hands after she asked her if she wanted to clean up.  On cross-examination, she acknowledged that
Fran was upset, concerned, and trying to help her husband and that Fran told
her she was afraid that she had lost her soul mate.

Larry Allen Moore testified that on November 22,
2003, he was the sheriff of Jones
 County.  He stated that he went to the scene and
identified William Herman.  The body was
then transferred to the Tarrant County Medical Examiner=s
Office in Fort Worth.  

Caesar Melendez testified
that on November 22, 2003, he was employed as a deputy sheriff for the Jones
County Sheriff=s
Department.  He said that he received a
call about 5:30 a.m. from 9-1-1 dispatch that there had been an accidental
shooting that had occurred out of a domestic disturbance.  According to Deputy Melendez, the dispatcher
gave the address as that of the Brazee residence.  He indicated that he found Fran inside the
residence crying but that he did not see any tears.  He said she told him her husband Will had
shot himself.  He related that she had
blood on her clothing and body, except for her hands.








Deputy Melendez identified State=s Exhibit No. B-2 as showing the garage
area of the Herman residence, indicating that that was where the initial large
pool of blood was found.  He identified a
spent .22 long rifle shell casing located inside the house, approximately
twelve feet from the doorway leading to the garage.  He also related that there was another spent
casing found at the scene of the body and another found jammed in the mechanism
of the rifle, indicating that three shots had been fired.  He noted that the initial blood splatter was
between a pickup and a weight machine inside the garage.  Deputy Melendez stated that, in his opinion,
the body had been moved a little from where it initially fell.  He said that he believed it initially fell
where the large area of blood was. 
Deputy Melendez also identified a gold wedding band found approximately
four feet from Will=s
head.  He indicated that the body was
found, along with the green pickup, 698 feet from the Herman residence.  He related that there was a trail of blood
along the road.  He acknowledged that no
bullets, including the bullet that killed Will Herman, were ever found.

Deputy Melendez testified that the entrance wound
was on the left side of the body and the exit wound was on the right side.  On cross-examination, Deputy Melendez
acknowledged that he did not know when the shell casing that was found inside
the residence twelve feet from the door leading to the garage was fired.  He said that no blood was found inside the
residence. 

On redirect examination, Deputy Melendez testified
that Fran reenacted with an investigator her struggle with Will for the
gun.  He said she demonstrated that they
were four to six inches apart with the weapon pointing up.  He indicated that the bullet appeared to
travel level.  He stated that he did not
believe that such a struggle would cause the wound that Will suffered.  He expressed his opinion that the wound did
conform to the theory that someone stood at the door, fired the weapon, and
ejected the shell.  Deputy Melendez
confirmed that there was a drop between the door and the floor of the garage,
which he believed would be consistent with the bullet passing through lower on
the other side.  After acknowledging that
one would not have a clear shot from the doorway to the pool of blood found in
the garage area, Deputy Melendez expressed his opinion that it was not likely
that anyone shot from the doorway.  On
redirect examination, Deputy Melendez testified that there was no obstruction
from the inner edge of the door to where the blood started.  Later, Deputy Melendez said that he was not
sure whether there was such an obstruction and then said that, to his
knowledge, there was no obstruction. 
Deputy Melendez finally acknowledged that it would be fair to say that
in his opinion it was possible for someone to have shot from the doorway, but
not likely.  He insisted that he really
could not remember because it was so long ago.








Felix Ortiz, Chief Deputy for the Jones County
Sheriff=s
Department, testified that on the occasion in question he went to the scene
where Will=s body
was located.  He stated that the entrance
wound was under the left ear and that the exit wound was under the right
ear.  He said that Fran told him that,
after she and Will had awakened early, they argued over their finances but that
each prepared to go to their job as prison guards.  He indicated that she told him that, while
she was loading her lunch and snacks into her vehicle, Will entered the
residence and returned with the rifle. 
Chief Deputy Ortiz said she told him that she approached Will, thinking
he was going to shoot her, the dogs, or himself.  She indicated that the gun accidentally
discharged as they were fighting over the gun. 
He related that she said she saw blood on Will and that Will started
running with the gun. 

Chief Deputy Ortiz testified
that in a later discussion with Fran she said that, after the gun discharged,
Will started running but she had the gun. 
He said that she told him she did not know why she did not drop the
gun.  Later, Chief Deputy Ortiz
acknowledged that it was probably not uncommon to get such details
confused.  He related that she stated she
had been unable to reach 9-1-1 after running back to the house but that she did
reach a Mrs. Rutledge.  Chief Deputy
Ortiz stated that that was not probable because if she could have reached Mrs.
Rutledge she could have reached 9-1-1. 
He acknowledged that she said Mr. Rutledge was an EMT and would know
what to do.  He also acknowledged that
the projectile fired from the rifle was never found, despite extensive
effort.  Referring to the reenactment
that Fran did for an investigator, Chief Deputy Ortiz stated that, if the
struggle happened like Fran demonstrated, the entrance and exit wounds would
not have been where they were and that it was not possible.  Chief Deputy Ortiz indicated that the only
thing between the door leading to the garage and where the blood started was
Will=s
pickup.  He said there was no obstruction
between the door and where the blood started. 
He repeated that Will=s
body was found about 698 feet from the garage. 
He noted that there were spent shell casings found near the body.  He said that two unspent shell casings
matching the others and a change of address form for Will were found in Fran=s purse located in the pickup.  He stated investigators also found a paper in
Fran=s purse
with the word Arevenge@ on it that contained revenge tactics
to get back at someone.  On the back of the
paper, it was written, AJalapeno
pepper juice on underwear, baby oil on windshield wipers, stink bait put in
hubcaps, crickets in his trailer, call his utility company, nitroglycerin tabs
and revenge.@  Chief Deputy Ortiz recalled that, while Fran
was distraught and crying, he never saw her shed a tear.  On cross-examination, Chief Deputy Ortiz
acknowledged that he was not aware of how Fran expressed sorrow and despair and
that he was aware that people exhibit despair or sadness differently.








On cross-examination, Chief Deputy Ortiz
acknowledged that no work charting the trajectory of the bullet that struck
Will had been done.  Chief Deputy Ortiz
identified photographs showing bloodstains on the gate that Fran told him she
had crawled over to get to the Brazee house. 
He acknowledged that he also found bloodstains on the sidewalk, which
was consistent with Fran telling him she had gone up to the house.

Chief Deputy Ortiz testified that it would not be
possible for a spent shell casing arising from a fight over a gun in the garage
to end up inside the house.  He indicated
that a shot from the doorway would be consistent with the location of the shell
casing.  He said Fran did not account for
two more rounds fired at the scene where Will died.  However, he then recounted that her first
version was that Will had the gun and they struggled for it out on the county
road and that her second version was that Will lunged for the gun after she had
laid it down, resulting in another struggle over the weapon.  Chief Deputy Ortiz confirmed that it was not
unusual in a murder investigation for the projectile that killed the individual
not to be found.

Lois Suzette Carufel testified that she worked for
Kinder Hearts Pediatric Home Health and that on the occasion in question she
was working at the Robertson Unit of the Texas Department of Criminal
Justice.  She said that on November 21,
2003, she had had a conversation with Fran about getting even with ex-husbands,
mentioning certain things she had done to hers. 
She indicated Fran was upset with her husband because Fran was working
three jobs to his one and was trying to get the bills paid while he was out
drinking with his buddies.  Fran had also
said her husband was living in a trailer, wanted a divorce, and wanted to sell
the house and give her less than half the proceeds.  She acknowledged that Fran had never
indicated she was going to try to hurt or kill her husband and that she had
never seen any evidence of that kind of anger on Fran=s
part.  

Marvin Rutledge, a retiree from the Texas
Department of Criminal Justice, testified that he met Will Herman when Will
came back from Bosnia.  He indicated Will brought six guns to him to
store.  Rutledge indicated that there was
a weapon missing, a .22 rifle.  He said
he believed it was a Mossberg.  He
related that Will was planning on staying at a trailer on his farm.  Rutledge indicated that Will told him that
Fran had broken into his gun case and taken out the .22 rifle.

Rutledge testified that Will asked him to keep the
guns and not let Fran know that he had them. 
He related that Will acted like he was scared to death that she was
going to find them.  Rutledge said Will
told him that he was afraid Fran was going to shoot him.  He indicated that, on the day before he was
shot, Will said that if he was accidentally shot not to let Fran get away with
it.  Rutledge acknowledged that Will and
Fran were trying to work out their marital problems.








James Cate, an employee of the Texas Department of
Criminal Justice at the Robertson Unit, testified that he worked with
Fran.  He said that on November 21, 2003,
she told him that on a prior occasion she had put Visine in her husband=s coffee and that the day before she
had made him sick at his stomach by putting a whole bottle of Visine in his
coffee.  He said they discussed other
ways she could make him uncomfortable and that she was going to her computer
that night to see if she could find out anything that would cause him
discomfort.  He indicated that during the
divorce process Will had offered Fran $10,000 for their house that she valued
at approximately $100,000.  He
acknowledged that he had not reported any of this to anyone because he did not
think there was really a danger.  He also
acknowledged that he was not sure what the date was.

Rene Funk testified that she was formerly employed
by Hendrick Medical Center
as a staff nurse and supervisor at the Robertson Unit.  She indicated that on November 21, 2003,
Fran, who was working at the unit, asked her if men go through a change of
life.  She stated that Fran told her that
Will had been going through it for what seemed like years.  She related that Fran started to have more anger
in her voice when she told her that Will wanted a divorce.  She overheard Fran tell someone else, AI just feel like killing him.@ 
She indicated that at that time her speech sounded a lot angrier and
that it was very rapid.  She acknowledged
that such a statement as AI
just feel like killing him@
is a normal thing to say when someone is irritated at another person.

Cosme Perez, an employee at the Robertson Unit of
the Texas Department of Corrections, testified that he overheard Fran angrily
telling someone that she was going to kill her husband.  He indicated there was also a discussion
about money, a girlfriend, and the sale of the house, followed by her moving to
San Antonio.  He said he did not give the statement a
second thought because he did not think it was a serious deal.

Renata Jefferson, an employee at the Robertson Unit,
testified that Fran asked her to go to Sherry Hill=s
house and pick up a manila envelope and a printer.  She said Fran told her they were bills that
she did not want Will to see.  She
related that, when they arrived at Hill=s
residence, Hill closed the door in their faces and called the Abilene Police
Department.  She said that, when the
police arrived, Hill gave the officer a manila envelope, who handed it to
Fran.  She denied that Fran ever talked
about how long she needed to be married to Will.








Sherry Hill testified that Fran had left with her
some bills she did not want Will to see because she did not want him to see how
much in debt they were.  She recounted
that on November 14, 2003, Fran came beating at her door, yelling at her, and
telling her she wanted her papers and printer back.  She said she called the police and gave them
Fran=s
papers.  She indicated that she did not
return the printer because she had previously paid Fran for it.  She also testified about going with Fran to a
pawnshop to pick up a gun that Fran did not want her husband to find out she
had pawned. 

Katherine McKenna said that on the day of the
shooting Fran called her and told her that during the struggle with Will the
rifle had gone off three or four times and that she thought it had gone up in
the air.

Fran and the State stipulated that the spent
cartridges found at the scene were fired from the .22 Mossberg rifle found at
the scene and that the unfired cartridges found were suitable for use in that
rifle.

Patricia Eddings, an employee of the Tarrant
County Medical Examiner=s
Office Crime Laboratory, testified that she had been trained in the discovery
and detection of gunshot residue.  She
said that the residue from a gunshot can sometimes go out as far as 20 to 25
feet, depending on the particular weapon, type of ammunition, and atmospheric
conditions.  She indicated that one
particle unique to gunshot residue was found on Will=s
left palm, while particles characteristic of gunshot residue were found on the
back of the left hand.  She said that in
her report she said this finding was consistent with someone having discharged
a firearm, being in the vicinity of a discharged firearm, or touching an object
on which gunshot residue was positive. 
She testified that no residue was found in the entry wound.  On cross-examination, Eddings acknowledged
that she would be surprised if a .22 rifle would expel a cloud of residue as
far away as 20 to 25 feet.








Dr. Marc Andrew Krouse testified that he was the
Chief Deputy Medical Examiner in Fort
 Worth.  He
indicated that his examination of Will=s
body showed no gunpowder residue on Will=s
wound.  He further indicated that,
generally speaking, a .22 caliber weapon firing a long rifle cartridge will
deposit gunpowder that can easily be seen out to four and a half to five
feet.  He acknowledged that a test that
could determine the amount for the particular .22 Mossberg rifle involved in
this case was not conducted.  Dr. Krouse
said that the track  of the bullet was
from left to right, very slightly downward, and slightly front to rear between
the point of entry and exit.  He repeated
that relative to the head the track of the bullet was basically level with a
slight downward deviation.  Dr. Krouse
acknowledged that it was possible and not unusual for someone to run 698 feet
with the kind of injury Will suffered. 
Dr. Krouse concluded that the shot would have come from Will=s left and fired horizontally, from a
distance outside of three and a half to four feet.  He indicated that Will was not so close to
the weapon when it was fired that his wound could have resulted from two people
arguing over a weapon.

Edward Dale Butts testified that he had been in
the home of Fran and Will on several occasions and that he had never observed
any indication or evidence of violent tendencies between them.  He said that it seemed to him that they had
almost a perfect relationship.

Doug Wheatley, an employee of the Texas Department
of Criminal Justice at the Robertson Unit, testified that he knew Will and
Fran.  He said Fran and Will seemed to
have a good relationship and did not seem to have any problems while he was
around.  He said it was his impression from
conversations with Fran that practical jokes were a common thing in their household.  He stated that he never knew of Fran to say
anything nor did he observe anything indicating a violent tendency on her part
toward Will.  He related that he never
had any concerns of violence between them.

Wheatley testified that, after Will was shot, Fran
told him that Will came out of their house with a gun in his hands and that he
was shot when the gun went off as she was trying to take it from him.  He said she indicated that she did not know
whether she had hit the trigger or something happened to make it go off.  According to Wheatley, Fran said that Will
was running toward the road and fell at the road, all while running to a
neighbor=s house
for help.  Wheatley testified that Fran
seemed distraught and sad after the shooting.

Dr. Joe Bob Alexander, a medical doctor, testified
that he agreed that it was possible for an individual to have walked and moved
himself or herself some 700 feet after sustaining an injury such as that
sustained by Will.  He also testified
that, while most people produce tears when they cry, not everyone does.  He concluded that when someone cries but does
not produce tears it does not necessarily mean that they are not really
grieving.  He testified that Will had
been referred for an MRI because of head trauma after he had fallen from a
ladder sometime in November 2003.  He
acknowledged that he was not sure of the date.








Dale Kocher testified that he was a sergeant with
the Texas Department of Criminal Justice, serving as a supervisor of
correctional officers.  He indicated that
he knew Fran and was her friend.  He
stated that he did not ever know Fran to Adisplay
or to comment about@ wanting
to harm or injure her husband.  He said
she had once come in to work with red hair because Will had put Kool-Aid in the
showerhead.  He indicated that he had
never observed any conduct on Fran=s
part that would lead him to believe that she would be violent toward Will.  He said it would make no sense for someone to
talk about killing somebody before they did it. 
He acknowledged that he did not care for Will.

Richard Murphree, a correctional officer with the
Texas Department of Criminal Justice, testified that he knew Fran.  He said that in the two years he had worked
with her he never observed or noticed any characteristics of violent conduct.

Marjorie Batchelder, Fran=s
cousin, testified that when she met Fran after the shooting she was distraught
and appeared to have been crying.  She
indicated that there was a grieving process during the next two to four days
during which Fran cried a lot and was depressed.  She said Fran told her the shooting was a
tragedy and an accident.  She
acknowledged that Fran told her there had been a struggle and the gun went
off.  She said Fran did not tell her
about chasing Will down the road with a gun in her hand or anything about
chasing Will down the road with his carrying a gun.

Douglas Batchelder, Marjorie=s husband, testified that Fran was
pretty shaken up when they first saw her. 
He said he observed nothing abnormal about how Fran grieved.  He stated that he never heard Fran relate
this event as anything other than a very horrible accident.  

Timothy Nguyn, Fran=s
son, testified that he lived with Fran and Will in 2000 and observed that they
talked a lot and were happy with each other. 
He related that in the summer of 2003 he moved back in with them and
observed changes in Will.  He said Will
was reclusive and that he drank more and was angrier than before.  He related that, in anger, Will had punched a
hole in the wall and thrown a phone at the wall.  He related that Will bragged about beating
the inmates.  He also mentioned that Will
had fallen from a ladder, hitting his head on it.  Nguyn acknowledged that the family played
practical jokes on each other as a game without any intent to harm anyone.








Fran denied that she intended to shoot Will.  She said her relationship with Will was good
after their marriage in 1994.  She said
that over time they had normal problems over bills and did not spend as much
time together since each was working more than one job.  She said they played pranks on each other.

Fran testified there was a difference in Will
after he returned from Bosnia
where his National Guard unit had been deployed.  She indicated that he angered easily, his
mood swings would change, and he started drinking a lot.  She indicated that he was taking a lot of
painkillers and was getting upset at every little thing.  She spoke of his spending all day on internet
porn sites, making her feel inadequate.

Fran testified that Will=s
mood swings became more frequent and that he began getting headaches after an
automobile accident in which his head hit the car=s
windshield.  She insisted that she and
Will still had romantic times even as what was wrong with Will increased.  She stated that from June or July 2003
through October 2003 there were times she did not think the marriage was going
to make it because he was coming home drunk or she was sometimes having to go
to a friend=s house
to pick him up.  She said Will worked
four days on and four days off and that he was getting drunk all four of his
days off.  She said that she told him on
October 8, 2003, that she wanted a divorce because of all the drinking, the
mood changes, and his anger issues.  She
indicated that Will had a seizure on October 10.  She said she changed her mind about the
divorce after the seizure.

Fran testified that she did not know that two .22
caliber shells of the same type used in the shooting were in her purse at the
time of the shooting but that she knew how they got there.  She said that, when she had pawned guns
earlier in June or July, this gun was loaded and the pawnshop employee unloaded
it.  She stated that she then stuffed the
shells into her purse.  Fran explained
that she thought she had taken out all the shells from the guns but that she
must have overlooked the two in question.








With respect to a list of pranks she had made, she
explained it was a list of suggestions made by other employees as to pranks she
could play in response to pranks that Will pulled on her.  She indicated that the word A[r]evenge@
on the list was another word for Aprank@ and that she never meant it as
revenge.  With respect to the suggestion
that she had put Visine in Will=s
coffee, she intimated that she suspected he had put some in her coffee and
that, although she had told everyone she had put Visine in his coffee, she had
not ever actually done so.  Fran
testified that on the morning of the shooting, after she and Will had had their
usual discussion about work, Will started screaming, AFran,
we don=t have
any money.@  Fran indicated that, as she discussed the
matter with him, he got more and more angry, saying, AYou
don=t understand, Fran.  We don=t
have any money.@  She related that, as they were putting their
work-related material in their vehicles, Will started screaming again about
money.  Fran stated that Will said, AI=m
tired that we don=t got no
money.  Fran, you don=t understand no money.  I=m
just sick of this life,@
then went back into the house.

Fran testified that when Will came back out of the
house he was staring at her and appeared to Azone
out.@  She said that at that time she noticed he had
a weapon.  She stated she was scared and
nervous because she knew something was wrong since employees of the Texas
Department of Criminal Justice are not allowed to have firearms at work, even
in their vehicles.  She related that,
when Will failed to respond to her asking what was wrong, she grabbed the
weapon and that they struggled.  She
testified that when they both fell back the weapon went off.  She insisted that she did not intentionally
fire the weapon or shoot her husband. 
She stated that they both started running after the weapon went off,
even though she saw a little bit of blood coming from Will.  She acknowledged that she had the weapon in
her hand as she was running but did not realize she still had it.  She related that, as Will was running, he was
telling her to leave him alone, that he wanted to die.  She indicated that when they got near the
Brazee residence, Will grabbed the gun from her, said he wanted to die, placed
it under his chin, and fired it about three times as they again struggled over
the gun.  She then discussed her efforts
to comfort Will and get help for him. 
She denied removing Will=s
wedding ring.

The only explanation Fran offered for the shell
casing in the house was that it was somewhere on her person when she ran back
in and that it fell out.  She explained that
when she went back in the house she called Mr. Rutledge instead of 9-1-1
because he was only a couple of minutes away while 9-1-1 was in Anson.  She acknowledged that she may have said
something at work along the lines of AI
am going to kill him@
but that everyone she knows says that.  

We hold that from this evidence a rational trier
of fact could have found the essential elements of murder beyond a reasonable
doubt.  We further find that the evidence
is not so weak that the verdict is clearly wrong and manifestly unjust and that
the contrary evidence is not so strong that the standard of proof beyond a
reasonable doubt could not have been met. 
Consequently, we hold that the evidence is legally and factually sufficient
to support the conviction.








Fran urges that the evidence is insufficient
because the State failed to prove that she intentionally and knowingly caused
Will=s
death.  As she herself notes, intent and
knowledge can be inferred from the acts, words, and conduct of the accused.  Hart v. State, 89 S.W.3d 61, 64 (Tex. Crim. App.
2002).  She relies on her testimony as to
how it happened and on testimony given by Deputy Melendez that the State=s theory that Will was shot from the
doorway connecting the house to the garage was possible, but not likely.  

The jury was not required to accept Fran=s testimony as true.  See Nelson v. State, 848 S.W.2d 126,
132 (Tex. Crim. App. 1992).  Deputy
Melendez=s
conclusion that Will being shot from the doorway connecting to the house was
not likely was based on his assumption that a shooter would not have a clear
shot from that location.  Reference to
Deputy Melendez=s
testimony shows that it was contradictory as to whether a shooter would have a
clear shot from the doorway.  Deputy
Melendez finally stated that he could not remember because the shooting had
happened Aso long
ago.@  Also, as previously noted, Deputy Melendez
testified that Will=s wound
conformed to the theory that someone stood at the door and fired the weapon.

Evidence such as the lack of gunpowder residue
found on Will=s wound,
the spent shell casing found in the house near the garage door, the ill feeling
between the parties, Fran=s
comments similar to AI
am going to kill him,@
and the fact that in Fran=s
demonstration the weapon was pointing up, whereas Will=s
wound was relatively level, all support the jury=s
verdict.    We overrule issues one and
two.

Fran contends in issue three that the trial court
erred when it denied her motion for mistrial based on the State=s improper argument applying the parole
law.  In responding to Fran=s plea that she receive community
supervision rather than confinement in the Texas Department of Criminal
Justice, Institutional Division, counsel for the State argued: 

Is
that punishment?  I don=t think so.  What do I recommend as punishment in
this?  I would like to have a life
sentence in it to make sure that people know that Jones
County says, AYou
will not commit [a] murder in Jones
 County.@ 
But you are the ones that have to do that, assess years, assess life.

 








Let=s look at
how old William Herman was when he was murdered.  He was 42 years of age.  What is the average life expectancy of people
today?  85 -- 80 to 85, something like
that.  Now, I could be wrong in
there.  I would like to see Frances
Herman in the penitentiary so that every day she wakes up and says, AWhat am I doing here?  It=s
because I killed my husband.  I murdered
him.  I assassinated him.@ 
So you add B you
subtract the 85 -- or the 42 from 85 and you get 43 years.  Now, 43 years, she would only have to serve
22 and a half before she --

 

At this point, Fran=s
counsel objected because the argument was untrue and outside the record and
because the jury is not to consider the application of the parole law to the
case.  Counsel for the State responded
that it was just referring to the portion of the court=s
charge indicating that one has to serve at least one-half of one=s sentence before becoming eligible for
parole.  The trial court sustained the
objection, instructed the jury not to consider the State=s
argument with respect to parole application, but denied Fran=s motion for mistrial.  Immediately after the admonition, the State
argued, without objection, ALadies
and gentlemen of the jury, y=all
are capable of adding and subtracting.  Y=all are capable of reading and writing.@ 


The issue before us is whether the trial court
abused its discretion in refusing to grant Fran=s
request for a mistrial.  Hawkins v.
State, 135 S.W.3d 72, 77 (Tex.
Crim. App. 2004).  In making its
determination as to whether to grant a mistrial, the trial court determines
whether improper conduct is so harmful that the case must be redone.  Id.  The harm analysis is conducted in light
of the trial court=s
curative instruction.  Id.  Only in extreme circumstances, where the
prejudice is incurable, will a mistrial be required.  Id.  In determining whether the trial court
abused its discretion, we apply a tailored version of the factors found in Mosley
v. State, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998): (1) the severity of
the misconduct (prejudicial effect), (2) curative measures, and (3) the
certainty of the punishment assessed absent the misconduct (likelihood of the
same punishment being assessed).  Hawkins,
135 S.W.3d at 77.   








The conduct was not severe.  The State did not call on the jury to
speculate as to how the parole law might affect Fran or as to when she might be
released on parole, except for telling the jurors what they could readily
determine from the court=s
charge B that she
would not even become eligible until she had served one-half of her
sentence.  The trial court instructed the
jury to disregard the argument.  Inasmuch
as the argument merely informed the jury of information it could easily have determined
under the court=s charge,
it is difficult to see how it might have changed the punishment assessed by the
jury.  Considering all three of the Mosley
factors, we hold that the trial court did not abuse its discretion in
denying Fran=s motion
for mistrial.  Fran relies upon the case
of Helleson v. State, 5 S.W.3d 393 (Tex. App.CFort
Worth 1999, pet. ref=d),
but, as she notes, the court in that case, a case very similar to the case at
bar, held that the trial court=s
instruction cured any error.  Fran relies
upon a subsequent argument that the jury was capable of adding and subtracting,
but there was no objection to that argument. 
As noted in Helleson, a defendant must object each time the
improper argument is made or the complaint is waived.  5 S.W.3d at 396.  We overrule issue three.       The
judgment is affirmed.   

 

PER CURIAM

 

November 2, 2006

Do not publish.  See
Tex. R. App. P. 47.2(b).

Panel
consists of:  McCall, J., and

Strange,
J., and Hill, J.[1]











[1]John G. Hill, Former Justice, Court of Appeals, 2nd
District of Texas at Fort Worth sitting by assignment.