

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 02-10-00432-CR

RYAN HARRISON                                                    APPELLANT

V.

THE STATE OF TEXAS                                                     STATE

----------

FROM THE 158TH DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

In nineteen points, Appellant Ryan Harrison appeals his capital murder conviction. We reverse and remand.

---

[1]*See* Tex. R. App. P. 47.4.

## II. Factual and Procedural History

On June 25, 2009, the State indicted Harrison for allegedly murdering Germaine Dawson while in the course of committing a robbery on March 25, 2009.

### A. Testimony at Trial

Josh Madden testified that on March 25, 2009, he gave Harrison's phone number to Dawson with the understanding that Dawson and Harrison were going to conduct a drug deal involving high grade "hydro" marijuana. Tremayne Standberry, Dawson's neighbor, testified that between 3:00 p.m. and 5:00 p.m. that afternoon, Dawson obtained from Standberry's apartment two ounces of marijuana, which Harrison was supposed to buy for $500 an ounce. Madden testified that between 6:05 p.m. and 6:15 p.m. that evening, Dawson called him to ask how far away the meeting location in Lewisville was. Melissa Buchanan, Dawson's girlfriend, testified that she had been text messaging Dawson throughout the afternoon and evening of March 25 but that Dawson had stopped replying between 7:00 p.m. and 7:30 p.m. And Standberry testified that Dawson did not return home that night.

On March 26, 2009, Harrison, Madden, and Standberry engaged in a three-way telephone conversation.[2] Madden testified that during the

---

[2]The details about how this became a three-way conversation are disputed. Melissa Perry, Madden's girlfriend, testified that Madden called Harrison, who was already talking with Standberry; Madden testified that it was

conversation Harrison said, "The deal went left. . . . The bitch got crazy, and I had to hit that ho nine times, and I let off six and three stayed in the chamber." Madden stated that Harrison hung up the phone but called back later explaining that "the deal went left" and that they both went their separate ways. Perry testified that this conversation was on speaker mode and that Harrison said that "things were supposed to go right but they went left." She testified that when she asked Harrison where Dawson was, Harrison hung up and would not answer his phone after that. Standberry testified that Harrison[3] told him during the conversation that he had the money and the marijuana but that Standberry said that he was not concerned about either of those and simply wanted to know if Dawson was okay. In response, Harrison told Standberry that the deal "went left," which Standberry understood to mean that the deal had gone badly.

According to the autopsy results, the cause of Dawson's death was homicide by multiple gunshot wounds to the head. Detective Wawro testified that he believed that the murder occurred between 7:15 p.m. and 7:30 p.m. on March 25, 2009.

---

Harrison who called Madden rather than Madden who called Harrison; and Standberry testified that Madden called him and connected him with Harrison.

[3]Standberry testified that the person on the phone identified himself as "Cliff," and Harrison told Lewisville Police Department Detective William Wawro that Cliff is his nickname.

3

## B. Harrison's Statement

Harrison was arrested on March 31, 2009, but in his recorded interview with Detective Wawro, Harrison said that he did not know that he was being arrested for murder. He also denied having been involved in a drug transaction. Harrison claimed that he had planned to buy a cubit[4] of marijuana for $250 from a person whose phone number Madden had given to him but that he did not end up meeting this person because he lacked transportation to meet him in Lewisville.[5] He stated that Madden and Madden's girlfriend had called him later that evening to ask about Dawson's whereabouts but that he told them that he had been unable to meet with Dawson.

Harrison stated that on the day in question, he was using a cell phone that belonged to his cousin, Derrick Day, because Sprint disconnected Harrison's cell phone due to his inability to pay his bill.[6] Harrison said that he stayed at Day's house all day and had Day's cell phone with him the entire time.

When Detective Wawro told Harrison that cell phone records indicated that he had been in Lewisville that evening, Harrison admitted that he was at the drug

---

[4]Harrison told Detective Wawro that a cubit is one-quarter pound of marijuana.

[5]Detective Wawro told Harrison that based on the text messages sent and received between Harrison and Madden, he knew the drugs involved were $500 an ounce.

[6]Harrison stated that he was unemployed and that he lived with his eighty-year-old grandmother as well as with his mother and his uncle, both of whom were unemployed.

4

deal with Madden but denied being the shooter. Harrison said that Madden had picked him up at his aunt's house and that Harrison stayed in the car while Madden went into Dawson's car to conduct the transaction. Harrison said that he did not know what went wrong but that he heard gunshots and that Madden returned to the car and drove Harrison back to his aunt's house. Detective Wawro told Harrison that Madden could not have been with Harrison that evening because Madden's phone was in Denton immediately after the murder.[7] Harrison said that Madden's girlfriend had Madden's phone that evening, that Madden was using Day's phone while Madden and Harrison were together, and that Harrison did not personally send any text messages from that phone during that period of time.

When Detective Wawro told Harrison that he knew that Harrison was in Dawson's car, Harrison admitted that he was in the front seat doing the drug deal with Dawson while Madden sat in the back seat. Harrison stated that he was holding the marijuana to inspect it when, before he was able to pay Dawson, Madden shot Dawson multiple times and grabbed the marijuana from Harrison. Harrison admitted that he had told some of Dawson's friends that he had the marijuana, but he told Detective Wawro that he said this only to protect Madden.

---

[7]Harrison said that Madden lived in Denton at the time.

## C. Cell Phone Records

The trial court admitted into evidence call detail records for the cell phones belonging to Day,[8] Dawson,[9] Madden ,[10] and Harrison.[11] Using both the information in these records and the cell towers with which each cell phone "communicated," Denton Police Department Detective Keith Martin determined the approximate locations of these four individuals when they were using their cell phones from 5:30 p.m. to 11:30 p.m. on March 25, 2009.

Detective Martin testified that at 6:15 p.m., Madden's phone was near his Denton residence, Dawson's phone was near his Lewisville residence, and Harrison's and Day's phones were in southeast Dallas. Detective Martin testified that from 6:45 p.m. to 7:00 p.m., Madden's phone remained near his residence, Dawson's phone had moved to the murder scene, and Harrison's and Day's phones had moved northerly up Interstate 35. At 7:15 p.m., Madden's phone remained in the same location, Harrison's phone could not be located because it had no activity, and Dawson's and Day's phones were at the scene of the murder. At 7:45 p.m., Madden's phone remained in the same location, but Dawson's and Day's phones were near Day's residence by 8:00 p.m. At

---

[8]The last four digits of Day's cell phone number were 6239.

[9]The last four digits of Dawson's cell phone number were 0370.

[10]The last four digits of Madden's cell phone number were 4170.

[11]The last four digits of Harrison's cell phone number were 1836.

6

9:15 p.m., Harrison's, Day's, and Dawson's phones all had activity near Harrison's residence.

Harrison moved for a directed verdict, but the trial court denied this motion, and the jury found Harrison guilty and sentenced him to life in prison without parole.

### III.  Denial of Directed Verdict

In his fifteenth point, Harrison claims that the trial court erred by denying his motion for directed verdict because the evidence was legally insufficient to support his conviction for capital murder, and he asks us to reverse the judgment and enter an order of acquittal.

### A.  Standard of Review

A challenge to the denial of a motion for instructed verdict is actually a challenge to the sufficiency of the evidence. *Canales v. State*, 98 S.W.3d 690, 693 (Tex. Crim. App.), *cert. denied*, 540 U.S. 1051 (2003); *McCown v. State*, 192 S.W.3d 158, 160 (Tex. App.—Fort Worth 2006, pet. ref'd).  In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable

7

inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Isassi*, 330 S.W.3d at 638. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 2075 (2009). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Isassi*, 330 S.W.3d at 638; *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991) (holding that in determining the sufficiency of the evidence to show an appellant's intent and faced with a record that supports conflicting inferences, we "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution").

We must consider all the evidence admitted at trial, even improperly admitted evidence, when performing a sufficiency review. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Moff v. State*, 131 S.W.3d 485, 489–90

8

(Tex. Crim. App. 2004). The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Isassi*, 330 S.W.3d at 638; *Hooper*, 214 S.W.3d at 13.

## B. Law

In capital murder offenses committed during the course of a robbery, Tex. Penal Code Ann. § 19.03(a)(2) (West Supp. 2011),[12] the legal sufficiency standard applies to both the charged and underlying offenses. *Russo v. State*, 228 S.W.3d 779, 792 (Tex. App.—Austin 2007, pet. ref'd) (citing *Matamoros v. State*, 901 S.W.2d 470, 474 (Tex. Crim. App. 1995)). To establish the murder portion of the offense, the State must prove beyond a reasonable doubt that the defendant intentionally or knowingly caused the death of an individual as charged in the indictment.[13] Tex. Penal Code Ann. § 19.02(b)(1) (West 2011); *Russo*, 228 S.W.3d at 792.

---

[12]This section of the penal code provides in relevant part that "[a] person commits [capital murder] if the person commits murder as defined under Section 19.02(b)(1) and . . . the person intentionally commits the murder in the course of committing or attempting to commit . . . robbery." *Id.*

[13]The indictment alleged that Harrison intentionally caused the death of Dawson by shooting him with a firearm in the course of committing or attempting to commit the robbery of Dawson.

For murder to qualify as capital murder in the course of a robbery,[14] the defendant's intent to rob must be formed before or at the time of the murder. *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001). Proof of robbery "committed as an afterthought and unrelated to a murder" is not sufficient evidence of capital murder. *Alvarado v. State*, 912 S.W.2d 199, 207 (Tex. Crim. App. 1995); *Nelson v. State*, 848 S.W.2d 126, 131 (Tex. Crim. App. 1992), *cert. denied*, 510 U.S. 830 (1993) ("The point at which appellant formulated his intent to take his victim's property is critical to differentiating, in the abstract, between his commission of capital murder in the course of robbery and his commission of first degree murder, followed by theft."). If the jury could "rationally conclude beyond a reasonable doubt that the defendant formed the intent to obtain or maintain control of the victim's property either before or during the commission of the murder, then the State has proven that the murder occurred in the course of the robbery." *Conner*, 67 S.W.3d at 197. This is true even when the appropriation occurred after the murder. *Nelson*, 848 S.W.2d at 132. "[T]he requisite intent may be inferred from circumstantial evidence and from the

---

[14]Section 29.02 of the penal code provides in relevant part that a person commits robbery "if, in the course of committing theft . . . and with intent to obtain or maintain control of the property, he . . . intentionally, knowingly, or recklessly causes bodily injury to another." Tex. Penal Code Ann. § 29.02(a)(1) (West 2011). Theft, in turn, involves an unlawful appropriation, which can be satisfied by depriving the owner of his property without his effective consent. *Id.* § 31.03 (West Supp. 2011).

defendant's conduct." *Maldonado v. State*, 998 S.W.2d 239, 243 (Tex. Crim. App. 1999).

## C. Sufficiency Analysis

### 1. Murder

Madden testified, even if his testimony was improperly admitted, that Harrison said, in reference to the drug deal, that he "hit that ho nine times" and "let off six and three stayed in the chamber." *See Clayton*, 235 S.W.3d at 778. It was reasonable for the jury to infer from this evidence that Harrison was telling Madden that he had shot Dawson with a firearm. *See Hooper*, 214 S.W.3d at 16–17. It was also reasonable for the jury to infer that Harrison had the requisite intent when he shot Dawson because there was evidence that Harrison also told Madden that the "bitch got crazy" so he "had to" do what he did, which indicates that he responded knowingly or intentionally when, as other witnesses testified, the deal "went left." *See* Tex. Penal Code Ann. § 19.02(b)(1); *Hooper*, 214 S.W.3d at 16–17. Therefore, based on this evidence, a rational trier of fact could have found that Harrison intentionally or knowingly caused Dawson's death by shooting him with a firearm as alleged in the indictment. *See* Tex. Penal Code Ann. § 19.02(b)(1); *Isassi*, 330 S.W.3d at 638; *Russo*, 228 S.W.3d at 792.

Harrison controverted this evidence by telling Detective Wawro that Madden was the shooter. However, it was the jury's responsibility to resolve the conflicts between the witnesses' testimony and Harrison's statement and to judge the weight and credibility of the evidence. *See Isassi*, 330 S.W.3d at 638; *Brown*,

11

270 S.W.3d at 568. And we do not substitute our judgment for that of the jury, *see Williams*, 235 S.W.3d at 750, but instead determine whether the jury's inferences were reasonable based on the combined and cumulative force of all of the evidence when viewed in the appropriate light. *See Hooper*, 214 S.W.3d at 16–17.

It was reasonable for the jury to discredit Harrison's statement that Madden was the shooter because the evidence showed that Madden's phone remained near Madden's Denton residence all evening on March 25, while Harrison's and Day's phones moved from southeast Dallas to the murder scene and then back to southeast Dallas with Dawson's phone that evening. *See id.* Harrison tried to explain this by saying that Madden's girlfriend had Madden's phone in Denton at the time of the murder. However, it was reasonable for the jury to infer that Madden, who was in Denton when he gave Dawson directions between 6:05 p.m. and 6:15 p.m., could not have driven to southeast Dallas to pick up Harrison in time for Harrison's phone to have been detected moving northerly on Interstate 35 at 6:45 p.m. *See id.*

Furthermore, the evidence shows that Harrison changed his story several times during his interview with Detective Wawro, and because the jurors are the sole judge of the weight and credibility of the evidence, *see Brown*, 270 S.W.3d at 568, it was reasonable for them to conclude that Harrison was being untruthful and lacked credibility and to disbelieve his version of the events. *See Hooper*, 214 S.W.3d at 16–17. Therefore, we presume that the jury resolved any

12

conflicting inferences against Harrison and defer to that resolution. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Isassi*, 330 S.W.3d at 638. Accordingly, viewing all of the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found the essential elements of murder beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Isassi*, 330 S.W.3d at 638.

### 2. Robbery

Turning to the underlying offense of robbery, it was reasonable for the jury to conclude beyond a reasonable doubt that Harrison had formed the intent to obtain control of Dawson's marijuana either before or during the murder. *See Conner*, 67 S.W.3d at 197. As an initial matter, it was reasonable for the jury to conclude that Harrison stole the marijuana because Standberry testified that Harrison admitted on the morning after the murder that he possessed the marijuana. *See Williams v. State*, 937 S.W.2d 479, 483 (Tex. Crim. App. 1996) (recognizing that the fact that appellant murdered the victim rationally supports the conclusion that the items were stolen rather than taken with consent).

Also, Harrison's theft of the marijuana was not "an afterthought and unrelated to [the] murder" because he admitted that he met with Dawson intending to obtain marijuana, and the evidence demonstrates that he never intended to pay for it. *See Alvarado*, 912 S.W.2d at 207. First, witnesses testified, even if their testimony was improperly admitted, that Harrison planned to meet Dawson to obtain two ounces of high grade "hydro" marijuana that was

13

priced at $500 per ounce. *See Clayton*, 235 S.W.3d at 778. However, Harrison stated that he and two of the three family members with whom he lived were unemployed and that Sprint had shut his phone off because the bill was more than he could afford. From this evidence, it was reasonable for the jury to infer that Harrison did not have enough money to give Dawson $1,000 and, therefore, could not have intended to pay for the marijuana but, instead, met Dawson with the intent to steal the drugs. *See Hooper*, 214 S.W.3d at 16–17; *Russo*, 228 S.W.3d at 794 (stating that motive, such as being in financial straits at the time of the murder, is not an element of robbery but is relevant as a circumstance tending to prove guilt).

This inference is further supported by the contradiction between Harrison's statement that he was supposed to get one-quarter pound of marijuana for $250 and the evidence showing that he was supposed to buy half that much marijuana for four times the cost. Because of this inconsistency, it was reasonable for the jury to infer that Harrison lied about the amount and cost of the marijuana to make his story that he planned to pay for the drugs more believable. *See Hooper*, 214 S.W.3d at 16–17. Based on the combined and cumulative force of this evidence, we conclude that it was reasonable for the jury to infer that Harrison never intended to pay for the marijuana but, instead, intended to steal the marijuana from Dawson. *See id.*; *Matson*, 819 S.W.2d at 846.

Harrison claims that the evidence is insufficient to prove robbery because the marijuana was not recovered at all, much less recovered in his possession.

However, there is no legal requirement that property stolen must be recovered in whole or in part to constitute the offense of robbery. *Russo*, 228 S.W.3d at 794 (citing *Chaney v. State*, 474 S.W.2d 711, 712 (Tex. Crim. App. 1972)). While Harrison told Detective Wawro that Madden took the marijuana, it was the jury's responsibility to resolve the conflicts in the evidence and to judge the weight and credibility of the evidence. *See Isassi*, 330 S.W.3d at 638; *Brown*, 270 S.W.3d at 568. And we do not substitute our judgment for that of the jury. *See Williams*, 235 S.W.3d at 750. Instead, we presume that the jury resolved any conflicting inferences against Harrison and defer to that resolution. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Isassi*, 330 S.W.3d at 638.

Therefore, when viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found beyond a reasonable doubt all of the essential elements of capital murder, including the aggravating element of robbery involving the timely formed intent. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Isassi*, 330 S.W.3d at 638; *Russo*, 228 S.W.3d at 795. Accordingly, we overrule Harrison's fifteenth point.

## IV. Public Trial

In his first point, Harrison contends that the trial court violated his constitutional right to a public trial by excluding his family members and his friend from the voir dire proceeding.

## A. Pertinent Facts

When Harrison requested that his mother, grandmother, and friend be permitted to sit in the courtroom during the voir dire proceeding, the following exchange ensued:

[DEFENSE COUNSEL]: And we would request that the family members be able to sit. Pursuant to the seating chart, it looks as if the jury box, which has at least 12 seats, will have seats unavailable or – excuse me – seats available for them to be able to view the jury selection of this trial and we'd request that they be allowed to be present.

[THE STATE]: Judge, there are no seats in the gallery available, and I think that determines whether or not someone can come in and sit and watch a trial. When a courtroom is full, the courtroom is full.

I'm assuming, Your Honor, that you are going to allow them to be present during all other portions of trial, as well as the victim's family.

If the defendant's family should be allowed to sit in the jury box, we're going to have to ask that the victim's family be allowed to sit in the jury box, which I think also may cause a problem if you're having both families sitting in a small jury box.

I think if there was room in the courtroom, obviously they should be able to sit, but I don't think there's any available seats. We're even taking up seats all the way through the back. There isn't a single inch of space available in the gallery, and I think that's what predicates whether or not someone can be seated.

THE COURT: I agree with the state. The motion is denied. Bring the jury in.

[DEFENSE COUNSEL]: Well, Judge, also for the record, the seating chart that I have got has folks sitting on the opposite side of the bar. Jurors number 46 through 50 and 51 through 55 will actually be on the other side of the gallery. Those folks could either be moved over to the jury box –

THE COURT: Denied. Bring the jury in, Sheriff.

16

Two days later, and after voir dire had been completed, defense counsel made the following bystander bill:

Q. Are you representing Ryan Harrison with me in this particular matter?

A. Yes.

Q. Were you present on Monday, August 16th, before jury selection?

A. Yes.

Q. At that period of time, did we have individuals that wished to watch the voir dire proceedings?

A. We did.

Q. Who?

A. Pearly, his mother Regina, and a family friend.

Q. And were they present in the courtroom prior to the venire being brought up?

A. They were.

Q. And were we apprised that they would not be allowed to be present during voir dire?

A. We were.

Q. Now let's go to the actual venire. Were all the seats occupied in the gallery?

A. Yes.

Q. And, in fact, were individuals allowed to come to the other side of the railing and sit on the hard benches that are directly behind counsel table?

A. Yes.

Q. How many people were in the jury box during voir dire?

17

A. None.

Q. And is the courtroom large enough to where it could accommodate folding seats and/or empty seats to accommodate these three individuals?

A. Yes, both in the courtroom and in the aisle between the bench and the exit to the courtroom.

Q. Are you aware if other district courts have allowed individuals to sit in the jury box during voir dire?

A. I am.

Q. And have they been allowed to?

A. Yes.

Q. Thank you.

[DEFENSE COUNSEL]: That perfects the bill, Judge. Thank you.

[THE STATE]: Just a few questions, Your Honor.

[DEFENSE COUNSEL]: It's a bill, Judge. It's not open for cross-examination.

[THE STATE]: Then I'll just state for the record that there were no other – there was no victim family members in here during voir dire, either. There were no other spectators at all during voir dire because there was no room.

THE COURT: Further, for the record, the only people that are ever sat in the jury box while we were doing voir dire since I have been judge have been interns from the DA's office, people like that. There have never been any parties, any associates of parties, there have never been any relatives of parties.

I would consider it extremely dangerous to have placed those people anywhere other than in the gallery, and the gallery was full.

18

## B. Law

"In all criminal prosecutions, the accused shall enjoy the right to a . . . public trial."  U.S. Const. amend. VI; *Duncan v. Louisiana*, 391 U.S. 145, 148, 88 S. Ct. 1444, 1446–47 (1968) (recognizing that this right is protected against state action by the Due Process Clause of the Fourteenth Amendment).  In *Presley v. Georgia*, the United States Supreme Court decided that it is "well settled" that an accused's Sixth Amendment right to a public trial extends to voir dire proceedings.  130 S. Ct. 721, 723–24 (2010) (citing *Waller v. Georgia*, 467 U.S. 39, 104 S. Ct. 2210 (1984)).  Under the *Waller* test, a trial court may exclude the public under the following circumstances:

> [T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

467 U.S. at 48, 104 S. Ct. at 2216.  "Such circumstances will be rare, however, and the balance of interests must be struck with special care."  *Id.* at 45, 104 S. Ct. at 2215.

### 1. Overriding Interest

With respect to the first and fourth *Waller* requirements, despite the existence of weighty interests, a trial court's "broad and general" findings will not justify closure.  *Id.* at 48, 104 S. Ct. at 2216.

> The generic risk of jurors overhearing prejudicial remarks, unsubstantiated by any specific threat or incident, is inherent whenever members of the public are present during the selection of

19

jurors. If broad concerns of this sort were sufficient to override a defendant's constitutional right to a public trial, a court could exclude the public from jury selection almost as a matter of course. . . .

There are no doubt circumstances where a judge could conclude that threats of improper communications with jurors or safety concerns are concrete enough to warrant closing *voir dire*. But in those cases, the particular interest, and threat to that interest, must "be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered."

*Presley*, 130 S. Ct. at 725 (quoting *Press-Enter. Co. v. Super. Ct. of Cal., Riverside Cnty.*, 464 U.S. 501, 510, 104 S. Ct. 819, 824 (1984)).

Granting petition to review for the first time an appellate court's application of *Presley*, the court of criminal appeals recognized that jury-panel contamination and courtroom security are "indeed substantial concerns" but held that the trial court failed to "identify specific circumstances sufficient to remove its concerns . . . from the realm of the generic." *Steadman v. State*, No. PD-1356-10, 2012 WL 716010, at *6 (Tex. Crim. App. Mar. 7, 2012) ("Under *Presley*, it is obvious that either one alone could be sufficiently momentous to warrant closure under the appropriate circumstances."). Before voir dire in *Steadman*, the trial court insisted that the gallery was full and denied Steadman's request to seat his family members in the jury box or to allow them to sit or stand elsewhere in the courtroom, but the trial court "made no further explanation on the record why the appellant's family members would not be allowed in the courtroom during voir

20

dire." *Id.* at *1–2. Long after voir dire had been conducted, the trial court retrospectively entered express findings of fact,[15] which included in part:

> [1]. The space on each side of the gallery area is narrow. Persons standing or sitting in that area would be in close proximity to one or more of the persons on the panel.
>
> [2]. The case on trial was one which was expected to be "emotionally-charged[.]"
>
> [3]. The Court believed that having one or more of the Defendant's family members sitting in close proximity to the panel members would make such panel members uncomfortable and reticent to fully express their feelings, attitudes and possible prejudices.
>
> [4]. There was space adequate for the Defendant's family members to sit or stand in the area behind "the bar," and in front of the bench.
>
> [5]. The space behind the bar [a]nd in front of the bench is reserved for parties, their attorneys, the attorney's support staff and court personnel.
>
> [6]. Allowing persons other than the parties, their attorneys, the attorney's staff and court personnel in this space creates security concerns.
>
> [7]. Security concerns are heightened in this case.

---

[15]Immediately after the trial court refused to open the trial to the public, it granted Steadman's request to make a bill of exception "later on," but Steadman never pursued this bill. *Id.* On appeal, the State maintained that because Steadman never pursued the bill, the lack of findings in the record was not the State's fault and that the cause should be remanded for additional fact findings. *Id.* at *2. The court of appeals granted this motion, and the trial court entered its findings accordingly. *Id.* at *2–3. When the court of criminal appeals granted petition, it chose not to address the "thorny issues" related to whether the court of appeals should have allowed the trial court "to file supplemental findings of fact to retroactively justify a ruling that the record reveals was originally made solely on the basis of an inadequate concern for overcrowding." *Id.* at *5.

21

[8]. Placing chairs for family members to sit in the area in front of the bench would interfere with access by the Court bailiff and other security personnel to the Defendant.

[9]. There was space adequate for the Defendant's family to sit or stand in the jury box.

[10]. The jury box is reserved for the selected jury members during a jury trial.

. . . .

[11]. There are no other courtrooms in the Taylor County Courthouse larger than the 350th District Court courtroom.

[12]. The central jury room on the first floor of the Taylor County Courthouse is a significantly larger space than the 350th District Court courtroom.

[13]. Moving the voir dire proceedings to the central jury room area after the sixty person panel had been seated could cause delay.

[14]. The central jury room is not configured as a courtroom. [Its] use as a venue for voir dire is inconvenient.

[15]. The central jury room is less secure than the 350th District Court. In March, 2008, the Taylor County Courthouse did not use a metal detector or otherwise restrict the public's open access to the first floor.

[16]. The Court did not seek to close the voir dire process but only to control the courtroom arrangement for security and decorum purposes.

*Id.* at *3.

In light of these findings, the court of criminal appeals reasoned that "[w]hile the judge identified two 'particular interests' sufficient, in the abstract, to exclude the public, he failed to 'articulate' a tangible 'threat' to either of the interests he identified." *Id.* at *6 (citing *Presley*, 130 S. Ct. at 725) ("*Presley* took

22

pains to emphasize that 'broad' or 'generic' concerns will not serve to justify closure; otherwise, they could become talismans for exclusion of the public in any and every case.").

As for jury-panel contamination resulting from the close proximity between spectators and prospective jurors, the court emphasized the inexistence of concrete facts related to this concern other than the "space limitations in the courtroom itself." *Id.* at *7. The court clarified that concrete facts might include "evidence of any outburst on the part of the appellant's family members," a "history of such outbursts in prior court proceedings," a "particular basis to suppose that the family members would attempt to speak to, or otherwise try to communicate with or influence, any of the prospective jurors simply because of their proximity." *Id.* "Without more tangible evidence of an actual or impending threat," the court concluded that the trial court's belief or fear regarding jury-panel contamination could not actually constitute an overriding interest. *Id.* (cautioning that to exclude members of the public based on what might happen "is too speculative to defeat the appellant's otherwise compelling Sixth Amendment right to have them present").

As for courtroom security, the court highlighted the absence of concrete facts—such as prior public violence, a "documented history of disruptive or contumacious conduct in the courtroom," or a suggestion of threats made against court participants—to support the trial court's conclusion that security concerns were heightened. *Id.* In concluding that the trial court's findings were

23

insufficiently documented, the court observed that "[i]f the fact that emotions might run high in the course of a locally sensational trial could alone justify closure, a trial court would be entitled to exclude the public—not just from voir dire proceedings but from entire trials—in any number of criminal cases." *Id.*

## 2. Reasonable Alternatives

With respect to the third *Waller* requirement, the trial court, not the defendant, has the burden to consider reasonable alternatives to closure:

> Trial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials. Nothing in the record shows that the trial court could not have accommodated the public at Presley's trial. Without knowing the precise circumstances, some possibilities include reserving one or more rows for the public; dividing the jury venire panel to reduce courtroom congestion; or instructing prospective jurors not to engage or interact with audience members.

*Presley*, 130 S. Ct. at 725.

In *Steadman*, the court of criminal appeals identified three alternatives that the trial court, insofar as the record revealed, failed to consider sua sponte. *Steadman*, 2012 WL 716010, at *8 ("That a trial court can reasonably discount *some* alternatives, however, does not insulate it from *Presley*'s mandate that it be able to sensibly reject '*all* reasonable alternatives' before it can exclude the public from voir dire proceedings." (quoting *Presley*, 130 S. Ct. at 725)). First, the court discussed the trial court's failure to consider dividing the venire panel to reduce courtroom congestion. *Id.* The court also observed that the trial court did not consider instructing the prospective jurors not to interact with audience

24

members and that the record revealed no concrete reason to believe that such an instruction "would lack efficacy." *Id.* (concluding that if the trial court had both divided and instructed the panel, any danger would have been "wholly defused"). Finally, the court pointed out that the trial court could have placed prospective jurors in the jury box, allowing the family "to observe the voir dire from the seats thus vacated in the gallery." *Id.*

## C. Analysis

### 1. Overriding Interest

Just as the trial court did in *Steadman*, the trial court in the present case initially excluded Harrison's family on the basis of overcrowding and made no further explanation on the record before voir dire apart from agreeing with the State's assertion that seating both families in the jury box "may cause a problem." *See id.* at *1–2. Afterwards, when Harrison made his bill of exception, the trial court stated that it "would consider it extremely dangerous to have placed those people anywhere other than in the gallery."[16]

---

[16]To the extent that it is argued that we should remand this case for findings of fact the way that the court of appeals did in *Steadman*, we note that Harrison made his bystander bill, while Steadman never pursued his bill. *See id.* at *2. We also note that the trial judge who presided over this case below is no longer sitting. *Cf. Taiwo v. State*, No. 01-07-00487-CR, 2010 WL 2306040, at *3 n.2 (Tex. App.—Houston [1st Dist.] Sept. 29, 2010, pet. ref'd) (mem. op., not designated for publication) (citing *Garcia v. State*, 15 S.W.3d 533, 535 (Tex. Crim. App. 2000) ("[I]t is not appropriate for the second judge in the instant case to make findings of fact based solely on the written transcript of the initial hearing.")).

25

We acknowledge that courtroom security is indeed a substantial concern in the abstract and could alone be "sufficiently momentous to warrant closure under the appropriate circumstances." *See Steadman*, 2012 WL 716010, at *6. However, like in *Steadman*, the trial court failed to "identify specific circumstances sufficient to remove its concerns about . . . courtroom security from the realm of the generic." *See id.*

Indeed, even if the trial court adopted the State's assertion that seating both families together "may cause a problem," this finding regarding what might happen is inherently "too speculative to defeat [Harrison]'s otherwise compelling Sixth Amendment right to have them present." *See id.* at *7. And the trial court's statement that it "would consider" the families' proximity to each other to be dangerous is, without more, merely a statement of the trial court's belief or fear that cannot constitute an overriding interest under *Steadman*. *See id.* The speculative and abstract nature of these statements is only enhanced when we consider that nothing in the record suggests that the victim's family was even present and interested in attending voir dire. *See id.*

In addition to being speculative and abstract, neither of these findings specified what the problem or danger might have been and, thus, failed to articulate a tangible, actual, or impending threat. *See id.* at *6–7. As in *Steadman*, the record lacks concrete facts such as "evidence of any outburst on the part of the [parties'] family members," a "history of such outbursts in prior court proceedings," prior public violence, a "documented history of disruptive or

contumacious conduct in the courtroom," a suggestion of threats made against each other, or a particular basis to suppose that the family members would speak to or otherwise interact with each other because of their proximity. *See id.* at *7; *Johnson v. State*, 137 S.W.3d 777, 779 (Tex. App.—Waco 2004, pet. ref'd) (holding that the trial court was acting to preserve an overriding interest to protect the jury from improper influences when the trial court excluded the defendant's aunt from the courtroom after her actions had already threatened to improperly influence the jury). Although Harrison was standing trial for capital murder, the *Steadman* court considered the defendant's prior public violence, not the alleged violence for which he was standing trial at the time. *See Steadman*, 2012 WL 716010, at *7. And even if we were to consider the nature of Harrison's alleged crime, nothing in the record suggests that his alleged violent character is transferable to his friend and family members.

The only concrete fact in the record to support the closure is that there were space limitations in the gallery, and even if we were to conclude that the trial court reasonably expected violence to erupt between families in close proximity to each other during an emotionally-charged trial, this would be insufficient to justify closure. *See id.* at *3, 7. As *Steadman* cautioned, if it were sufficient, "a trial court would be entitled to exclude the public—not just from voir dire proceedings but from entire trials—in any number of criminal cases." *See id.* at *6–7; *Presley*, 130 S. Ct. at 725 (noting that if broad concerns were enough, "a court could exclude the public from jury selection almost as a matter of course").

27

Because the threat to courtroom safety was speculative, abstract, and unsupported by tangible evidence or concrete factual findings, the trial court failed to satisfy *Waller*'s requirements to advance an overriding interest that closure was likely to prejudice and to make findings adequate to support closure. *See* 467 U.S. at 48, 104 S. Ct. at 2216; *Steadman*, 2012 WL 716010, at *5–7.

## 2. Reasonable Alternatives

Even if the trial court had sufficiently documented facts to reasonably discount Harrison's first proffered alternative to closure, this did "not insulate it from *Presley*'s mandate that it be able to sensibly reject '*all* reasonable alternatives' before it [could] exclude the public from voir dire proceedings." *See Steadman*, 2012 WL 716010, at *8 (quoting *Presley*, 130 S. Ct. at 725). Indeed, Harrison's attorney was in the middle of offering another alternative when the trial court interrupted him midsentence and ordered the bailiff to bring the prospective jurors into the courtroom. Insofar as the record reveals, this alternative was one mentioned in *Presley*—seating a few prospective jurors in the jury box, which would have allowed the two families to concurrently but separately "observe the voir dire from the seats thus vacated in the gallery." *See id.*

As in *Steadman*, the trial court in this case also failed to consider sua sponte the possibility of dividing the venire panel in half to reduce courtroom congestion. *See id.* (citing *Presley*, 130 S. Ct. at 725). Also, nothing in the record suggests that admonishing the families not to interact with each other, much like the admonishment in *Presley* to the prospective jurors not to interact

28

with audience members, would have lacked efficacy. *See id.* (citing *Presley*, 130 S. Ct. at 725). Indeed, as in *Steadman*, combining more than one of these alternatives likely would have defused any danger about which the trial court had concerns. *See id.*

Therefore, in addition to failing to satisfy *Waller*'s first and fourth requirements, the trial court failed to satisfy *Waller*'s third requirement to consider all reasonable alternatives to closure. *See* 467 U.S. at 48, 104 S. Ct. at 2216. Instead of the closure being a situation in which the trial court took "special care" to strike a balance between competing the interests, *see id.* at 45, 104 S. Ct. at 2215, the trial court excluded Harrison's family members and friend "almost as a matter of course." *See Presley*, 130 S. Ct. at 725. Thus, we cannot say that this was one of the rare circumstances in which the trial court was justified in excluding the public from the voir dire proceeding. *See id.* at 724 (citing *Waller*, 467 U.S. at 45, 104 S. Ct. at 2215). Accordingly, the trial court violated Harrison's Sixth Amendment right to a public trial, *see* U.S. Const. amend. VI, and we must sustain his first point.

### 3. Relief

The State argues that even if the exclusion was unjustified, it was too trivial to subvert the values of the public trial guarantee. The Second Circuit has recognized a triviality exception under which convictions are affirmed when exclusions, while unjustified, are "deemed to be too 'trivial' to implicate the interests protected by the Sixth Amendment right to a public trial." *Steadman*,

29

2012 WL 716010, at *9 n.41 (quoting *United States v. Gupta*, 650 F.3d 863, 864 (2d Cir. 2011)). However, the court of criminal appeals held that "[w]hen the constitutionally tainted portion of trial encompasses the entire jury-selection process," as it did here, "relief involves a new voir dire and a new jury; perforce, it necessitates a new trial." *Id.* at *9. Accordingly, under *Steadman*, we are constrained to sustain Harrison's first point without considering whether the unjustified closure subverted the values of the public trial guarantee. *See id.* at *9 & n.41.

## V. Conclusion

Because we overruled Harrison's fifteenth point but sustained his first point, we reverse the trial court's judgment and remand the case to the trial court for a new trial.[17]

PER CURIAM

PANEL: MCCOY, GARDNER, and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: March 29, 2012

---

[17]Because these points are dispositive, we need not address Harrison's remaining points. *See* Tex. R. App. P. 47.1.